## Raw Material Comparison
## Alpha Olefin vs Paraffins

### Alpha Olefins - $C_{12}$ Pure Compound

$CH_2=CHCH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_3$ 99.3% Typical

### Paraffins - Short Chain $C_{10-13}$ Mixture

| | | |
|---|---|---|
| $CH_3CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_3$ | $C_{14}$ | 0.5 - 1.3 % |
| $CH_3CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_3$ | $C_{13}$ | 7 - 10 % |
| $CH_3CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_3$ | $C_{12}$ | 40 - 44 % |
| $CH_3CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_3$ | $C_{11}$ | 38 - 42 % |
| $CH_3CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_3$ | $C_{10}$ | 8 - 20 % |
| $CH_3CH_2CH_2CH_2CH_2CH_2CH_2CH_2CH_3$ | $C_9$ | 0.1 - 0.6 % |

$$CH_2CH_3 \quad CH_2CH_3$$
$$CH_3CHCH_2CHCHCH_2CH_3$$
$$CH_3$$

Paraffin isomers such as the one shown and ring hyrocarbons - 1.2 - 2 %

Aromatic impurities 0.9 to 1.5 %

## Any combination of the above

Kenneth COMFORT, Plaintiff,

v.

TOWN OF PITTSFIELD, William Lawrence, Wilfred Dodge, Christopher Tremblay, and Mary Heath, Defendants.

Civ. No. 95–106–B.

United States District Court, D. Maine.

April 12, 1996.

1220

Dale F. Thistle, Thistle & Tardy, Newport, Maine, for Plaintiff.

Edward R. Benjamin, Jr., Preti, Flaherty, Beliveau & Pachios, Portland, Maine, for Defendants.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

This suit arises out of the May 15, 1993 arrest of Plaintiff Kenneth Comfort in Pittsfield, Maine. Comfort sues Officers Wilfred Dodge, Christopher Tremblay and Mary Heath of the Pittsfield Police Department, Pittsfield Police Chief William Lawrence, and the Town of Pittsfield for violations of his state and federal constitutional rights, under 42 U.S.C. §§ 1981, 1983, 1988, 5 M.R.S.A. § 4682 and 14 M.R.S.A. §§ 8101–8118. Comfort also alleges violations of his state statutory rights and asserts common law claims for negligence, assault, battery and intentional infliction of emotional distress.[1]

Comfort originally filed suit in Somerset County Superior Court (May 12, 1995, Docket Number CV–95–60). Defendants, however, successfully removed this action to the United States District Court for the District of Maine, in Bangor, pursuant to 28 U.S.C. § 1446 and Rule 81(c) of the Federal Rules of Civil Procedure. Defendants now seek summary judgment under various state and federal immunity doctrines. The Court denies Defendants' motion in part, and grants it in part.

## I. Summary Judgment

Summary judgment is appropriate in the absence of a genuine issue as to any material fact, when the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). Facts may be drawn from "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." *Id.* An issue is genuine, for summary judgment purposes, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact is one which has "the potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir. 1993). The Court views the record in the light most favorable to the nonmoving party.

---

1. Comfort filed a six-count complaint seeking damages for the violation of, and conspiracy to deprive him of, his First, Fourth, Fifth and Fourteenth Amendment rights under the United States Constitution (Count I), as well as damages pursuant to 5 M.R.S.A. §§ 4681–4685 for violation of his federal rights, his rights under Article 1, §§ 1, 6 and 6–A of the Maine Constitution, and 15 M.R.S.A. § 704, 17 M.R.S.A. § 2931 and 17–A M.R.S.A. § 107–108 (Count II). He also seeks recovery for assault, battery and intentional infliction of emotional distress (Count III), Pittsfield's negligent failure to train its police officers (Count IV), Chief Lawrence's negligent failure to train and supervise the officers in his charge (Count V), and common law negligence against Officers Tremblay and Dodge (Count VI).

**1226**

*FDIC v. Anchor Properties,* 13 F.3d 27, 30 (1st Cir.1994).

## II. Background

On or about May 15, 1993, Pittsfield Police Officers Christopher Tremblay and Wilfred Dodge were on duty patrolling the streets of Pittsfield, Maine. At approximately 1:00 a.m., Tremblay and Dodge stopped Plaintiff Kenneth Comfort on Forest Street, on the suspicion that Comfort was driving under the influence (an "OUI" offense). The Officers subjected Comfort to various sobriety tests. Comfort allegedly failed these tests, prompting Tremblay and Dodge to take him into custody and transport him to the Pittsfield Police Station for an Intoxilyzer test. Based on statements Tremblay made to Comfort, Comfort believed that if he passed the Intoxilyzer test the Officers would return him to his truck on Forest Street. Comfort cooperated and was not handcuffed.[2] These facts are generally undisputed.

What happened next is controverted. The Court views the facts in the light most favorable to Comfort, as summary judgment requires. Comfort alleges that upon arriving at the Pittsfield Police Station, Tremblay asked Officer Mary Heath, the on-duty dispatcher, to call a tow truck to recover Comfort's vehicle. Comfort became agitated due to Tremblay's previous assurances that the truck would not be towed if Comfort passed the Intoxilyzer test. A "heated argument" ensued. Tremblay then arrested Comfort, handcuffing him, and allegedly pushed him toward a doorway. As they entered the doorway Comfort claims that Tremblay shoved Comfort's head against the door jamb causing a blow to the right side of his face. (Comfort Aff., ¶ 9.) Comfort recalls receiving a second blow to his head as he began to lose consciousness. (*Id.* at ¶ 10.) He ultimately fell to the ground, striking his head on the floor of the police station. Comfort claims he later awoke in a pool of blood. (*Id.* ¶ 11.)

Comfort was ultimately transported to the Sebasticook Valley Hospital. He claims to have suffered damage to his right eye, contu-sions to the right side of his face, lacerations on his chin, and broken teeth on the left side of his face.

Comfort claims that he did not resist any of the Officers' aggressions. He also notes that the Officers handcuffed him prior to the alleged beating. Comfort also asserts that neither Tremblay nor Dodge read him the implied consent form detailing the consequences of an OUI suspect's refusal to submit to a chemical exam.

Pittsfield Police Officer Ronald Richards corroborates Comfort's story on several key points. Richards was on duty the night of Comfort's arrest, and arrived at the Pittsfield Police Station in response to a call to assist. When Richards arrived at the station he "found Kenneth Comfort laying on the floor bleeding excessively about the face." (Richards Aff., ¶ 5.) Richards alleges that he found Tremblay and Dodge standing over Comfort, and heard Tremblay "yelling at [Comfort] in an extremely agitated voice." (*Id.* at ¶ 6.) Richards told both Tremblay and Dodge to remove Comfort's handcuffs and let him sit up. (*Id.* at ¶ 9.) Tremblay allegedly told Richards: "I thought I killed him." (*Id.* at ¶ 8.)

Comfort also disputes the authenticity of the Officers' police reports documenting his arrest. Comfort claims that Dodge wrote an incident report detailing the circumstances surrounding Comfort's arrest, which Tremblay later rewrote. Officer Richards corroborates Comfort's story, stating that Tremblay conceded that he "changed [Dodge's] report to reflect a theory consistent with Plaintiff's injury to his right eye." (*Id.* at ¶ 13.)

Richards never filed a report on the Comfort arrest. According to Richards, Chief Lawrence was conducting an internal investigation as to Comfort's arrest, but never questioned Richards on the matter. Lawrence allegedly told Richards "to just stay out of it." (*Id.* at ¶ 17.)

Dispatcher Mary Heath also filed an "Incident Report" detailing Comfort's arrest,

---

**2.** Plaintiff alleges that Tremblay's failure to handcuff him at the scene violated the Standard Operating Procedure of the Pittsfield Police Department, which requires patrolmen to handcuff and search OUI arrestees.

which Comfort claims is inaccurate. Specifically, Comfort contests the authenticity of Heath's dispatch logs, which she produced during discovery. He points to subtle changes in the handwriting and style of Heath's reports in support of his theory that Heath conspired with Tremblay and Dodge to coverup the events which transpired during Comfort's arrest.[3]

### III. Federal Claims: § 1983

Comfort seeks damages under 42 U.S.C. § 1983 for violation of his First, Fourth, Fifth and Fourteenth Amendment rights under the United States Constitution. The Defendants move for summary judgment on the basis of qualified immunity.

▆ The Supreme Court has extended qualified immunity generously, imposing a heavy burden on plaintiffs to establish liability. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"). This policy is justified on a variety of grounds, not least of which is a fear that "personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Knight v. Mills*, 836 F.2d 659, 666 n. 9 (1st Cir.1987) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)). Nonetheless, relief is available for plaintiffs who make the proper showings because if government officials abuse their offices "an action for damages may offer the only realistic avenue for vindication of [the plaintiff's] constitutional guarantees." *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982).

▆ Generally, qualified immunity shields "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738; *see Prokey v. Watkins*, 942 F.2d 67, 72 (1st Cir.1991); *Burns v. Loran-*

*ger*, 907 F.2d 233, 235 (1st Cir.1990). Qualified immunity, thus, is not absolute. Furthermore the standards for immunity are not uniform across the various groups of Defendants named in this action. The law divides § 1983 claims into three categories: individual officers, supervisory personnel, and municipalities. The Court addresses Plaintiff's claims accordingly.

### A. Individual Officers

▆ Qualified immunity for individual officers revolves around a two-part inquiry involving: (1) the nature of the constitutional or statutory right at issue, and (2) the reasonableness of the law enforcement official's conduct. *Anderson*, 483 U.S. at 639–40, 107 S.Ct. at 3038–39; *Burns*, 907 F.2d at 235–36. To overcome qualified immunity, a plaintiff must first allege the violation of a clearly established constitutional or statutory right. *Id.* If the right is clearly established, the court assumes that the police officer in question knew of this right. *Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738–39; *Rodriguez v. Comas*, 888 F.2d 899, 901 (1st Cir.1989); *see Maguire v. Municipality of Old Orchard Beach*, 783 F.Supp. 1475, 1480 (D.Me.1992) (clearly established means the unlawfulness of the act must be apparent in light of pre-existing law). Second, if the right is clearly established, qualified immunity will only be denied if a reasonable official should have known that the challenged conduct violated that established right. *Rodriguez*, 888 F.2d at 901. Applying law to fact, only Comfort's Fourth Amendment claims and the related conspiracy claims survive the qualified immunity inquiry.

#### 1. Fourth Amendment: Excessive Force Claim

Comfort claims that Officers Dodge and Tremblay both conspired to, and ultimately violated his Fourth Amendment rights by using excessive force in carrying out his arrest. The Court addresses each claim in turn, applying the above stated two-part test governing qualified immunity.

---

**3.** Comfort also notes that at his criminal trial Heath testified that she shredded the original log sheet, contradicting her previous representation

that the log sheets she provided subsequent to her deposition were photocopies of the originals. (Pl.Supl.Stat.Mat.Facts, ¶¶ 2, 4.)

### a. Substantive Claim

At issue is the Fourth Amendment and its prohibition against excessive force. The Fourth Amendment protects against the use of excessive force by police officers in carrying out an arrest. *Graham v. Connor*, 490 U.S. 386, 394–95, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989); *Gaudreault v. Salem*, 923 F.2d 203, 205 (1st Cir.1990), *cert. denied*, 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 (1991). This right is unquestionably an 'established right,' thus the Court assumes that Officers Tremblay and Dodge were cognizant of this right. *See Fernandez v. Leonard*, 784 F.2d 1209, 1217 (1st Cir. 1986) (holding that the right to be free from the use of excessive force has been well established since 1976).

The Officers' defense thus hinges on the second-step reasonableness inquiry. The Court must determine whether an objectively reasonable officer would have known that the degree of force used against Comfort violated his Fourth Amendment rights. *Graham*, 490 U.S. at 395, 109 S.Ct. at 1871; *Gaudreault*, 923 F.2d at 205. Qualified immunity does not require strict constitutional compliance, it only requires reasonable objectivity. *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039–40. Tremblay and Dodge are protected from liability even if they acted erroneously, yet reasonably in their use of force. *Id.* The Court looks to the contours of the Fourth Amendment to determine whether the force employed by the officers was reasonable.

The Fourth Amendment expressly guarantees that all people shall "be secure in their person ... against unreasonable seizures," U.S. Const. amend. IV, and its reasonableness standard—objective reasonableness—guides the inquiry into the appropriateness of any use of force. *Graham*, 490 U.S. at 394, 109 S.Ct. at 1870–71; *Gaudreault*, 923 F.2d at 205. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490

U.S. at 396, 109 S.Ct. at 1872; *see Alexis v. McDonald's Restaurants of Mass.*, 67 F.3d 341, 352–353 (1st Cir.1995). The Court, in measuring "reasonableness," considers the specific facts at issue, paying particular attention to the crime committed, its severity, the threat of danger to the officer and society, and "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872; *see also Gaudreault*, 923 F.2d at 205 (police are authorized to use the level of force "consistent with the amount of force that a reasonable officer would think necessary to bring the arrestee into custody"). Additionally the Court acknowledges that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397, 109 S.Ct. at 1872.

Based on the instant facts, a reasonable jury could find that the Officers' alleged aggression goes beyond the level of force necessary to effectuate Comfort's arrest, and therefore conclude that this force violate Comfort's Fourth Amendment rights. Reasonable officers would have known that "ramm[ing]" a subdued and handcuffed suspect's head into a door jam constitutes excessive force, and violates the suspect's Fourth Amendment rights. (Comfort Aff., ¶ 9.) *See, e.g., Fowles v. Stearns*, 886 F.Supp. 894, 901 (D.Me.1995) (alleged conduct of police officers who punched and kicked handcuffed plaintiff, who did not resist arrest, if true, would violate the Fourth Amendment); *McLain v. Milligan*, 847 F.Supp. 970, 976 (D.Me.1994) (alleged conduct of police officer who, after handcuffing Plaintiff, "kicked [his] legs out from under him, forced him to his knees, slammed his chest and face onto the concrete, placed his knee down on plaintiff's back, picked his head up by the hair and slammed his face down onto the pavement," if true, would violate the Fourth Amendment). Comfort claims he never resisted arrest, or threatened the Officers in any way.[4]

---

4. To the extent that Comfort's allegations ring true, Officers Tremblay and Dodge may both be liable for an the use of excessive force despite the fact that only one of the Officers took part in the

Tremblay and Dodge, under oath, deny Comfort's allegations and present a different set of facts, which in addition to the above analysis persuades the Court to deny summary judgment due to the remaining genuine issues of material fact.[5] Resolution of the lawfulness of the Officers' use of force is thus preserved for the fact-finder.

### b. Conspiracy

Comfort's conspiracy claim also survives summary judgment. A civil rights conspiracy consists of "a combination of two or more persons acting in concert to commit an unlawful act or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another and an overt act that results in damages." *Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir.1988) (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 620–621 (7th Cir.1979), *rev'd in part on other grounds*, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980)).

Conspiracy claims are actionable under § 1983, however "it is necessary that there have been, besides the agreement, an actual deprivation of a right secured by the Constitution and laws." *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir.1980); *Slavin v. Curry*, 574 F.2d 1256, 1261 (5th Cir.), *modified on other grounds*, 583 F.2d 779 (1978), *overruled on other grounds*, *Sparks v. Duval County Ranch Co., Inc.*, 604 F.2d 976, 978 (5th Cir.1979). "The gist of the [§ 1983] cause of action is the deprivation and not the conspiracy [itself]." *Landrigan*, 628 F.2d at 742 (quoting *Lesser v. Braniff Airways, Inc.*, 518 F.2d 538, 540 n. 2 (7th Cir.1975)). Conspiracy merely provides the mechanism by which to plead or prove the constitutional or statutory violation. *Landrigan*, 628 F.2d at 742.

To the extent that Comfort can establish an agreement between Officers Tremblay and Dodge to deprive him of his Fourth Amendment rights, he may recover damages. As discussed above factual disputes persist as to the reasonableness of the force used by Tremblay and Dodge in effecting Comfort's arrest. Questions also exist as to a possible agreement between the Officers as to this use of force in light of the alleged falsification of police records. Therefore summary judgment is inappropriate on this claim.

Officer Heath and Chief Lawrence can also be held liable for conspiracy given their claimed involvement in the alleged post arrest "cover-up."[6] Here too, there is a clearly established right at stake, and whether or not Tremblay, Dodge, Lawrence and or Heath conspired to deprive Comfort of his Fourth Amendment rights depends entirely upon which account a fact-finder adopts. Choosing amongst divergent facts, by assessing the veracity of evidence and testimony falls strictly within the province of the fact-finder. A reasonable jury could view the alleged falsification of police records, and the failure to properly investigate Comfort's arrest as efforts to deprive Comfort of his § 1983 right of action as to the alleged use of excessive force. Summary judgment is thus inappropriate, and therefore denied as to Comfort's Fourth Amendment conspiracy claim.

### 2. Due Process Rights

Plaintiff also alleges a violation of his Fifth Amendment due process rights. The Court

---

beating. *See Noel v. Town of Plymouth, Mass.*, 895 F.Supp. 346, 352 (D.Mass.1995) ("[C]ourts have held that a police officer who fails to prevent the use in his presence of excessive force by another police officer may be held liable under § 1983.") (*quoting Hathaway v. Stone*, 687 F.Supp. 708, 712 (D.Mass.1988)).

**5.** Defendants Tremblay and Dodge assert that they did not impose any force, lawful or otherwise against Comfort in effecting his arrest. They claim that as they escorted Comfort through the doorway he "resisted further movement by stiffening his body and refusing to

walk." (Def.Sum.J., 3.) Next the Officers claim that Comfort "continued to stiffen his body and to push back against the officers." *Id.* They allege that "[Comfort's] feet [then] became entangled and he tripped, causing all three men to fall forward through the doorway into the lobby of the town office." *Id.*

**6.** Plaintiff lodges his Count I claim against "Defendants," thus including Officer Heath and Chief Lawrence, named Defendants in this action.

assumes that Comfort refers to his Fourteenth Amendment right to due process, given the absence of the requisite federal action necessary to trigger the Fifth Amendment. While Plaintiff pleads this claim in a cursory fashion, he does present facts sufficient to merit review. Comfort's due process claim revolves around the alleged "cover-up" plotted by Tremblay, Dodge and Heath, which included the alleged alteration, fabrication and falsification of various police records detailing the events surrounding Comfort's arrest.

The Defendants' motion does not address the merits of Comfort's Fourteenth Amendment claim. They argue instead that this claim is merely a recasting of Plaintiff's Fourth Amendment excessive force claim. The Court agrees.

■ The qualified immunity inquiry begins, as always, with the alleged clearly established rights at issue. Here too the inquiry ends. Comfort fails to identify any federal rights in jeopardy, as the mere existence of falsified police reports do not in and of themselves violate any of Comfort's federal rights. *Landrigan,* 628 F.2d at 745. In *Landrigan v. City of Warwick,* the First Circuit held that "the mere filing of false police reports, by themselves without more, [does] not create a right of action in damages under 42 U.S.C. § 1983." *Id.* at 744–45. The court reasoned that for the purpose of recovering damages, the existence of a false report sitting in a police station filing cabinet does not itself deprive a person of a constitutional or statutory right. *Id.*

■ Falsified police reports are only actionable under § 1983 if those reports result in the deprivation of life, liberty or property. *Id.* If action is taken on the basis of falsified reports a plaintiff may file suit. *Id.* Here, however, as in *Landrigan,* "the [likely] focus of plaintiff's complaint is the allegedly

false charge pending against him—the police reports are mainly relevant to the extent they resulted in that charge." *Id.*

In the absence of more specific pleadings, it is not clear that the alleged false reports alone resulted in damages to the Plaintiff cognizable under § 1983, beyond those arising out of his Fourth Amendment claim.[7] The Court thus grants Defendants' Motion for Summary Judgment on the Count II due process claims.

### 3. First Amendment Claim

■ Comfort also brings a First Amendment claim under § 1983.[8] This claim is neither clearly articulated, nor legally significant. Again the Court must inquire whether Comfort had a clearly established First Amendment right, and if so whether a reasonably objective officer would have known that his or her conduct violated that right. *See Fonte v. Collins,* 898 F.2d 284, 285–86 (1st Cir.1990).

■ While Comfort may or may not have had a right to free speech under the First Amendment, the Officers in question never violated these rights. The First Circuit recently adopted a "but for" standard for § 1983 actions alleging First Amendment violations. *Tatro v. Kervin,* 41 F.3d 9, 18 (1st Cir.1994) (borrowing the "but for" standard from mixed motive employment discrimination cases). To prevail on a First Amendment claim against law enforcement officials under § 1983 "the plaintiff need only show that the officer's intent or desire to curb the expression was the *determining* or *motivating* factor in making the arrest, in the sense that the officer would not have made the arrest 'but for' that determining factor." *Tatro,* 41 F.3d at 18 (emphasis in original).

Comfort fails to direct the Court to any particular speech or actions that specifically led to his arrest. It seems likely that the

---

7. This is not to say that the false reports are not actionable under alternative state or common law theories. The Court merely rules as to their relevancy in relation to Comfort's § 1983 action.

8. Typical of Plaintiff's inarticulately drafted complaint, he never specifically asserts a First Amendment cause of action in any particular count. Rather Plaintiff only mentions a First

Amendment claim in the first line of the complaint, stating that: "[t]his action is brought pursuant to ... the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution." (Compl., ¶ 1.) Nonetheless the Court reviews this claim to avoid additional pleadings and future delay.

relevant statements are those concerning the Intoxilyzer exam, or the towing of Comfort's truck. In either case, however, it is clear that Officer Tremblay did not arrest Comfort simply because of these statements. Rather Comfort's arrest stemmed from his alleged erratic driving, and inability to perform the sobriety tests demanded of him. The Court grants Defendants' Motion for Summary Judgment as to Comfort's First Amendment claim.

**B. Supervisory Liability: Chief Lawrence**

In Count IV, Plaintiff seeks damages against Chief Lawrence under § 1983 for his failure to train and supervise Officers Tremblay, Dodge and Heath. Defendants construe this claim as "a municipal liability claim" based on Lawrence's "lack of personal involvement in Plaintiff's arrest and given his position as a policy administrator." (Def.Sum.J. at 13.) Defendants misconstrue the law. While Comfort does not allege that Lawrence was present or personally involved in his arrest or the alleged use of excessive force, these facts alone do not absolve Lawrence of liability. Supervisory liability may attach despite any direct involvement by Lawrence in the unconstitutional activity. *See Figueroa v. Aponte–Roque,* 864 F.2d 947, 953 (1st Cir.1989); *Bordanaro v. McLeod,* 871 F.2d 1151, 1159 (1st Cir.), *cert. denied, City of Everett, Mass. v. Bordanaro,* 493 U.S. 820, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989). Lawrence, however, may only be held liable under § 1983 on the basis of his own acts or omissions. *Bowen v. City of Manchester,* 966 F.2d 13, 20 (1st Cir.1992); *Guzman v. City of Cranston,* 812 F.2d 24, 26 (1st Cir.1987).

Supervisory personnel are liable under § 1983, upon a showing of a constitutional violation, when: (1) the supervisor's conduct or inaction amounts to either deliberate, reckless or callous indifference to the constitutional rights of others, and (2) an affirmative link exists between the street-level constitutional violation and the acts or omissions of the supervisory officials. *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 562 (1st Cir.1989); *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 902 (1st Cir. 1988). A supervisor, however, is not liable

for § 1983 claims under *respondeat superior. Monell v. Department of Social Services,* 436 U.S. 658, 694 n. 58, 98 S.Ct. 2018, 2037–38 n. 58, 56 L.Ed.2d 611 (1978); *Febus–Rodriguez v. Betancourt–Lebron,* 14 F.3d 87, 91 (1st Cir.1994).

The Court interprets Plaintiff's vague complaint to seek redress for both Chief Lawrence's (1) inadequate training of the Pittsfield Police Officers in his charge, and (2) his inadequate supervision of these Officers. For the reasons stated below the Court denies Chief Lawrence's Motion for Summary Judgment as to both claims.

**1. Failure to Train**

To be liable under § 1983, Chief Lawrence's failure to train Pittsfield Police Officers, as to the permissible use of force in carrying out an arrest, must have: (1) amounted to a deliberate indifference to the constitutional rights of Comfort, and (2) been affirmatively linked to the violation of Comfort's rights. *Febus–Rodriguez,* 14 F.3d at 92; *Gutierrez–Rodriguez,* 882 F.2d at 562. However, the need for more or better training alone, sufficient to have avoided the alleged injury, does not trigger § 1983 liability, because of the risk that "[s]uch a claim could be made about almost any [police] encounter resulting in injury." *City of Canton v. Harris,* 489 U.S. 378, 391, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989). Even a complete lack of training is not *per se* unconstitutional. *See Rodriques v. Furtado,* 950 F.2d 805, 813 (1st Cir.1991). Liability under § 1983 requires more. The Court turns to the requisite two-part test.

Comfort alleges, and provides supporting evidence, that Chief Lawrence encouraged his officers to be physically aggressive with arrestees, and thus by omission, failed to properly train the officers as to the appropriate level of force permissible in carrying out an arrest. The alleged conduct may display a deliberate indifference to the constitutional rights of others because "in light of the duties assigned to specific officers or employees the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that [Chief Lawrence] . . . can

reasonably be said to have been deliberately indifferent to the need." *Canton,* 489 U.S. at 390, 109 S.Ct. at 1205 (defining deliberate indifference in the context of municipal liability); *see Bordanaro,* 871 F.2d at 1159.

Comfort provides evidence from which the Court can glean Chief Lawrence's deliberate indifference, or at a minimum this evidence raises genuine issues of material fact regarding Chief Lawrence's deliberate indifference as to the training of Pittsfield Police Officers in the use of excessive force. *See Febus–Rodriguez,* 14 F.3d at 92 (courts find deliberate indifference when "it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights.") (quoting *Germany v. Vance,* 868 F.2d 9, 18 (1st Cir.1989)). Officer Richards asserts that Chief Lawrence "ran a physically aggressive police department," (Richards Aff. at ¶ 21), and that Lawrence did not properly train the officers in his charge, (*id.* at ¶ 20). Richards stated that Lawrence had criticized him and others on several occasions "for not reacting physically to a person who was in custody." (*Id.* at ¶ 22.) On one occasion, in response to Richards' handling of a "belligerent arrestee," Lawrence supposedly told Richards "you should have dragged him over and drove his face right into the bumper." (*Id.* at ¶ 23.) [9] Richards also contends that while the Pittsfield Police Department had Standard Operating Procedures concerning the towing of vehicles, proper OUI arrests, and the use of force, Chief Lawrence never trained officers in these procedures. (*Id.* at ¶¶ 19–20.)

Plaintiff also succeeds in raising significant questions as to the second prong affirmative link requirement. Based on this evidence a jury could conclude that Lawrence's failure to train his officers as to the appropriate use of force was likely a motivating factor behind the alleged mistreatment of Comfort. Chief Lawrence's alleged failure to train thus made a constitutional violation "almost bound to happen, sooner, or later," given his encouragement, indeed his alleged demand, that

Pittsfield Police Officers be physically aggressive with arrestees. *Bordanaro,* 871 F.2d at 1157 (quoting *Spell v. McDaniel,* 824 F.2d 1380, 1391 (4th Cir.1987)), *cert. denied, City of Fayetteville, N.C. v. Spell,* 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988).

▪ While Comfort presents no other specifics as to the formal training policy or program of the Pittsfield Police Department, Officer Richards' affidavit suffices to raise questions as to Chief Lawrence's training practices. Defendants briefly allude to the training Tremblay and Dodge received at the Maine Police Academy, however these facts do not rebut, or resolve the factual disputes relating to Lawrence's training policies regarding the use of excessive force. *See McLain,* 847 F.Supp. at 970 (failure to articulate specific training as to the skill area in question leaves open the issue of the constitutionality of the training program). The Court denies summary judgment as to Comfort's failure to train claim.

## 2. Supervision and Discipline

▪ Comfort also cites Chief Lawrence's poor supervision and failure to discipline his officers as a "driving force" behind the deprivation of his constitutional rights. Chief Lawrence states in his affidavit that "[p]rior to the events which are the subject of this lawsuit, no complaints concerning the use of excessive force or other misconduct by a police officer had been filed in the Town of Pittsfield for at least twelve years." (Lawrence Aff., ¶ 6.) For the purpose of summary judgment as to this claim, this evidence alone proves nothing. Comfort raises factual disputes, supported primarily by Officer Richards' statements, regarding Lawrence's supervision. In particular Comfort raises factual disputes as to whether Lawrence encouraged, demanded and even applauded the use of unconstitutionally excessive force against arrestees.

---

**9.** Richards cites other occasions as well in which Chief Lawrence encouraged rough treatment of arrestees. In one instance Richards states that Lawrence: "further chastise[d] me for being soft on arrestees by saying that I wasn't tough enough to make it in a place like Bangor, where he had previously worked, because I didn't like to get physical with subjects." (Richards Aff. at ¶ 24.)

The Court again turns to the two-part test for supervisory liability. *Gutierrez–Rodriguez*, 882 F.2d at 562 (deliberate indifference and affirmative link); *Lipsett*, 864 F.2d at 902–03 (same). Lawrence's alleged failure to properly investigate the events surrounding Comfort's arrest, or at a minimum his failure to question all of the witnesses, including Officer Richards, could support a jury finding of deliberate indifference. (Richards Aff. at ¶ 17) (Richards, who was at the scene of Comfort's arrest, claims that Lawrence never questioned him as to Comfort's arrest); *Grandstaff v. City of Borger, Texas*, 767 F.2d 161, 171 (5th Cir.1985) ("subsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy"), *cert. denied*, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987).

Comfort also provides sufficient evidence to establish the possibility that Lawrence's management style created an atmosphere in which the officers in his command believed that he would not punish their use of excessive force, thus establishing a deliberate indifference on the part of Lawrence. *See Voutour v. Vitale*, 761 F.2d 812, 820 (1st Cir.1985) (failure to discipline so pervasive as to allow an "inference of supervisory encouragement, condonation or even acquiescence"), *cert. denied, Town of Saugus v. Voutour*, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986).

Additionally genuine issues of material fact exist as to the causation prong of the qualified immunity test. Officer Richards' statements, cited above, provide evidence that Lawrence may have encouraged his officers to be physically aggressive regardless of the constitutional principles that govern the proper use of force. This encouragement could well establish the link between Chief Lawrence and the Officers on the scene. The Court denies Defendants' Motion for Summary Judgment as to Comfort's failure to supervise claim.

## C. Municipal Liability

■ Comfort also sues the Town of Pittsfield for its negligent failure to properly train and supervise its police officers. Municipalities are liable under § 1983 when their official policies or customs cause the alleged constitutional deprivation. *Oklahoma City v. Tuttle*, 471 U.S. 808, 818, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985); *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037–38; *Bordanaro*, 871 F.2d at 1156. The First Circuit has held that to succeed under § 1983 on a theory of municipal liability, the plaintiff must show: (1) a municipal custom or policy, and (2) that this custom or policy was "the cause of and the moving force behind the deprivation of constitutional rights." *Bordanaro*, 871 F.2d at 1156 (citing *Tuttle*, 471 U.S. at 819, 105 S.Ct. at 2434).

■ Comfort appears to seek redress from Pittsfield based on Chief Lawrence's conduct, and specifically his authority as the final decisionmaker over police policy.[10] While municipal liability does not attach under a theory of *respondeat superior, Canton*, 489 U.S. at 385, 109 S.Ct. at 1202–03; *Bordanaro*, 871 F.2d at 1155 (quoting *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036), the law allows Comfort to impute Lawrence's conduct to the Town of Pittsfield provided he is a "policymaker" within the Pittsfield hierarchy. *Jett v. Dallas Independent School District*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2723–24, 105 L.Ed.2d 598 (1989) (municipalities can be held liable under § 1983 for the decisions of a single policymaker); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124–128, 108 S.Ct. 915, 924–27, 99 L.Ed.2d 107 (1988) (same); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 489, 106 S.Ct. 1292, 1303, 89 L.Ed.2d 452 (1986) (same). In *Jett v. Dallas Independent*

---

10. As detailed below the Supreme Court has held that municipalities can be held liable for the acts of its policymakers to the extent that those actors have final decisionmaking power on policy issues, or alternatively that they are enforcing longstanding municipal policy or custom. *Jett v. Dallas Independent School District*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2723–24, 105 L.Ed.2d 598 (1989). In this instance, Plaintiff presents no evidence to assert liability under the later rationale, the Court therefore assumes that Plaintiff relies on a "final authority" theory to impute Chief Lawrence's actions to the Town of Pittsfield. Here again, the Court makes certain assumptions about Plaintiff's complaint necessitated by the poor drafting of his pleadings, and supporting memoranda.

*School District,* Justice O'Connor, writing for the majority, affirmed the plurality decisions in *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, and *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, holding that:

> the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actors concerning the actions alleged to have caused the particular constitutional or statutory violation at issue. Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue ... or by acquiescence in a long-standing practice of custom which constitutes the "standard operating procedure" of the local governmental entity.

491 U.S. at 737, 109 S.Ct. at 2724.

■ The First Circuit has held that "[a] municipality can be held liable if its police chief is a policymaker and acquiesces in a police custom or policy as to which he has actual or constructive knowledge." *Kinan v. City of Brockton,* 876 F.2d 1029, 1035 (1st Cir.1989); *see Praprotnik,* 485 U.S. at 122–26, 108 S.Ct. at 923–26. Whether a police officer constitutes a "policymaker" is an issue of state law. *Jett,* 491 U.S. at 737; *see, e.g., Woods v. City of Michigan City, Ind.,* 940 F.2d 275, 279 (7th Cir.1991) (Indiana state law determines whether judge has final policymaking authority); *Davis v. Mason County,* 927 F.2d 1473, 1480–81 (9th Cir.) (Washington state law determines whether sheriffs retain final authority as to the training of their deputies), *cert. denied,* 502 U.S. 899, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991); *Owens v. Fulton County,* 877 F.2d 947, 950–951 (11th Cir.1989) (Georgia state law determines whether district attorney had final policymaking authority).[11] State law "will always direct a court to some official or body that has the responsibility for making law or setting policy in a given area of a local government's business." *Praprotnik,* 485 U.S. at 125, 108 S.Ct. at 925. A policymaker, however, need not have "official" authority to make final decisions, such authority can be "implied from a continued course of knowing acquiescence by the governing body in the exercising of policymaking authority by an agency or official." *Spell,* 824 F.2d at 1387; *see Bennett v. Slidell,* 728 F.2d 762, 769 (5th Cir.1984) (en banc) (governing body may delegate policymaking authority by "its conduct or practice, [thus] encourag[ing] or acknowledg[ing] the agent in a policymaking role."), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985).

■ Neither party provides any evidence as to the controlling state law on this issue, and "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Praprotnik,* 485 U.S. at 126, 108 S.Ct. at 925.[12] While Comfort's pleadings lack both specificity and focus, he nonetheless provides sufficient evidence to cast Chief Lawrence as a policymaker for the purposes of summary judgment. Comfort raises factual issues as to whether Chief Lawrence "had complete authority and control over the hiring, training and supervision of police officers at the Pittsfield Police Department." (Pl. Opp.Sum.J., ¶ 33.) *See, e.g., Small v. Inhabitants of the City of Belfast,* 796 F.2d 544, 553 (1st Cir.1986) (decision of city manager with apparent authority to establish municipal policy imputed to city); *Bordanaro,* 871 F.2d at 1162 (police chief considered a policymaker because his "acts or edicts may fairly

---

**11.** In *Praprotnik,* the Court noted:

'Authority to make municipal policy may be granted by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law.' Thus the identification of policymaking officials is not a question of federal law, and it is not a question of fact in the usual sense. The States have extremely wide latitude in determining the form that local government takes, and local preferences have led to a profusion of distinct forms. 485 U.S. at 124, 108 S.Ct. at 924–25 (citing *Pembaur,* 475 U.S. at 483, 106 S.Ct. at 1299–1300).

**12.** Defendants present the Affidavit of Dwight Dogherty, the Town Manager of Pittsfield, however Mr. Dogherty does not comment on Pittsfield's policy and procedures as to police training and supervision, or the applicable state law.

be said to represent official policy") (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037–38). If Chief Lawrence's decisions were not reviewable by other Pittsfield Officials, a jury could infer that his decisions were attributable to the town itself.

The law saddles Pittsfield with the burden of demonstrating the absence of any genuine issues of material fact at summary judgment. The Town has failed in this responsibility. Plaintiff's evidence, specifically the affidavit of Officer Richards, raises factual disputes as to the constitutionality of Chief Lawrence's policies, and questions remain as to his status as a policymaker. Accordingly, the Court denies Pittsfield's Motion for Summary Judgment.

13. Article 1 § 1 of the Maine Constitution, entitled, "Natural rights," reads:

All men are born equally free and independent, and have certain natural, inherent and unalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness. Article 1 § 6, entitled, "Rights of persons accused," reads:

In all criminal prosecutions, the accused shall have a right to be heard by himself and his counsel, or either, at his election:

To demand the nature and cause of the accusation, and have a copy thereof;

To be confronted by the witness against him;

To have compulsory process for obtaining witnesses in his favor;

To have a speedy, public and impartial trial, and except in trials by martial law or impeachment, by a jury of the vicinity. He shall not be compelled to furnish or give evidence against himself, nor be deprived of his life, liberty, property or privileges, but by judgment of his peers or the law of the land. Article 1 § 6–A, entitled, "Discrimination against persons prohibited," reads:

No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of his civil rights or be discriminated against in the exercise thereof.

14. Title 15 M.R.S.A. § 704, entitled, "Arrests without warrant; liability," reads:

Every sheriff, deputy sheriff, constable, city or deputy marshal, or police officer shall arrest and detain persons found violating any law of the State or any ordinance or bylaw of a town, until a legal warrant can be obtained and may arrest and detain such persons against whom a warrant has been issued though the officer does not have the warrant in his possession at the time of the arrest, and they shall be entitled

## IV. Maine Civil Rights Act

In Count II Comfort claims the violation of his state and federal rights under the Maine Civil Rights Act, 5 M.R.S.A. § 4682. Specifically Comfort pleads claims under: (1) the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, (2) Article 1, §§ 1, 6 and 6–A of the Maine Constitution,[13] and (3) 15 M.R.S.A. § 704 (entitled, "Arrests without a warrant; liability"), 17 M.R.S.A. § 2931 (entitled, "Prohibition [against the use of force, intimidation, or interference with anyone's state or federal constitutional or statutory rights]"), 17–A M.R.S.A. § 107 (entitled, "Physical force in law enforcement"), and 17–A M.R.S.A. § 108 (entitled, "Physical force in defense of a person").[14]

to legal fees for such service; but if, in so doing, he acts wantonly or oppressively, or detains a person without a warrant longer than is necessary to procure it, he shall be liable to such person for the damages suffered thereby.

Title 17 M.R.S.A. § 2931, entitled, "Prohibition," reads:

No person may, by force or threat of force, intentionally injure, intimidate, or interfere with, or intentionally attempt to injure, intimidate or interfere with or intentionally oppress or threaten any other person in the free exercise or enjoyment of any right or privilege, secured to him by the Constitution of Maine or laws of the State or by the United States Constitution or laws of the United States.

Title 17–A M.R.S.A. § 107, entitled, "Physical force in law enforcement," reads in relevant part:

1. A law enforcement officer is justified in using a reasonable degree of nondeadly force upon another person:

A. When and to the extent that he reasonably believes it necessary to effect an arrest or to prevent the escape from custody of an arrested person, unless he knows that the arrest or detention is illegal; or

B. To defend himself or a 3rd person from what he reasonably believes to be the imminent use of nondeadly force encountered while attempting to effect such an arrest or while seeking to prevent such an escape.

Title 17–A M.R.S.A. § 108, entitled, "Physical force in defense of a person," reads in relevant part:

A person is justified in using a reasonable degree of nondeadly force upon another person in order to defend himself or a 3rd person from what he reasonably believes to be the imminent use of unlawful, nondeadly force by such other person, and he may use a degree of such force which he reasonably believes to be necessary for such purpose. However, such force is not justifiable if:

The Maine Civil Rights Act "was patterned after 42 U.S.C. § 1983," *Grenier v. Kennebec County*, 733 F.Supp. 455, 458 n. 6 (D.Me.1990), and employs the federal standard for qualified immunity, *see Jenness v. Nickerson*, 637 A.2d 1152, 1155 (Me.1994). Thus the qualified immunity analysis detailed above, applies to the Plaintiff's Count II Maine Civil Rights Act claims. Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's Count II due process claim under the United States Constitution and the parallel state claims under the Maine Constitution, Article 1 § 1 and § 6, but denies the motion as it relates to Comfort's Fourth Amendment claim. As to the remaining constitutional claims, Plaintiff also fails to articulate a theory of relief under Article 1 § 6–A of the Maine Constitution, and therefore the Court grants Defendants' Motion for Summary Judgment on this claim as well.

Lastly given the analysis in Section III above, the Court denies Defendants' Motion for Summary Judgment on the remaining state statutory claims articulated in Count II. The above discussion as to the reasonable level of force necessary to carry out Comfort's arrest highlights the factual discrepancies surrounding this claim, precluding summary judgment on the related claims under 17–A.M.R.S.A. §§ 107–108, and 15 M.R.S.A. § 704.[15]

## V. State Tort Claims

Counts III, IV, V and VI lodged against Officers Tremblay and Dodge, Chief Lawrence and the Town of Pittsfield, sound in common law torts to some extent. These claims fall within the ambit of the Maine Tort Claims Act ("MTCA"), 14 M.R.S.A. §§ 8101–8118. Defendants seek summary judgment based upon the immunity afforded governmental entities and their employees under the MTCA. 14 M.R.S.A. § 8111(1)(C). Neither the individual officers nor Chief Lawrence, however, benefit from the MTCA's protection, and the Court denies their Motion for Summary Judgment as to Count III, V and VI. The Town of Pittsfield, however, is immune from suit under the MCTA.

### A. Individual Officers

The MTCA protects law enforcement officials performing discretionary functions from suit even when that discretion is abused. 14 M.R.S.A. § 8111(1)(C); *Rippett v. Bemis*, 672 A.2d 82, 88–89 (Me.1996). An officer exercises his discretionary duties when he or she is "required to use [his or her] judgment while acting in furtherance of a departmental policy." *Moore v. City of Lewiston*, 596 A.2d 612, 616 (Me.1991); *see Lyons v. City of Lewiston*, 666 A.2d 95, 101 (Me.1995). A law enforcement official's use of force is a discretionary act. *Roy v. Inhabitants of City of Lewiston*, 42 F.3d 691, 696 (1st Cir.1994); *Leach v. Betters*, 599 A.2d 424, 426 (Me.1991).

The MTCA affords police officers discretionary immunity except to the extent they act in a manner so egregious as to "clearly exceed, as a matter of law, the scope of any discretion [they] could have possessed in [their] official capacity as [police officers]." *Lyons*, 666 A.2d at 101 (quoting *Polley v. Atwell*, 581 A.2d 410, 414 (Me.1990)); *see, e.g., Maguire*, 783 F.Supp. at 1478, 1487 (po-

---

A. With a purpose to cause physical harm to another person, he provoked the use of unlawful, nondeadly force by such other person. . . .

15. It is unclear whether or not 15 M.R.S.A § 704, "an ancient Maine statute," survives after the enactment of the Maine Tort Claim Act. *Jackson v. Inhabitants of Town of Sanford*, 1994 WL 589617, *7 n. 2 (D.Me.). In *Jackson v. Inhabitants of Town of Sanford*, Judge Hornby ruled that "the Maine Legislature enacted the Maine Tort Claims Act as a comprehensive measure to define the standard of liability under state law for governmental entities and employees, thus superseding 15 M.R.S.A. § 704." *Id.* This ruling however, was ultimately not dispositive given Judge Hornby held that "[i]f an exception to immunity for 'wanton and oppressive' conduct still existed, I would find that Officer Sanford's conduct falls well short of that standard." *Id.* In *Leach v. Betters*, however, the Maine Supreme Judicial Court assumed "that section 704 remain[ed] in effect and vital after the enactment of the Maine Tort Claims Act." 599 A.2d 424, 426 (Me.1991). Accordingly this Court reserves judgment as to the validity of § 15 M.R.S.A. § 704 in the instant case because if the facts alleged are proven at trial, a reasonable jury could find that Officers Tremblay and Dodge acted both wantonly and oppressively.

lice officer threatening plaintiff with night stick and future harm over dispute as to car towing exceeded scope of discretion).[16] Factual disputes remain as to the specific conduct of Defendants Tremblay and Dodge, precluding summary judgment on the Count III claims for assault, battery and intentional infliction of emotional distress, as well as the Count VI claim for negligence. As plead, albeit inartfully, the alleged conduct is egregious and well beyond the scope of the discretion afforded law enforcement officers in arresting OUI suspects. Accordingly, the Court denies Defendants' Motion for Summary Judgment as to Count III and VI.

## B. Chief Lawrence

■ Chief Lawrence also seeks discretionary immunity under § 8111(C) on Plaintiff's Count V negligence claim. Comfort challenges Lawrence's training practice and supervision, discretionary functions—as they require the "exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved." *Polley,* 581 A.2d at 413. However Lawrence is not entitled to discretionary immunity because the circumstances alleged raise genuine issues of material fact as to whether Lawrence clearly exceeded the scope of his discretion. *See Lyons,* 666 A.2d at 101. For example, if Lawrence did encourage the officers in his charge to be physically abusive of arrested suspects, a reasonable jury could find that he was negligence. The Court denies Lawrence's Motion for Summary Judgment on Count V.

## C. Town of Pittsfield

■ Once again Comfort's poor pleading has left the Court parsing through his complaint and pleadings in an effort to comprehend his claims. To the extent that Count IV states a common law claim of negligence against the Town of Pittsfield, the Court

grants Defendant's Motion for Summary Judgment pursuant to the MTCA. 14 M.R.S.A. § 8103(1).

■ Municipalities are generally immune from suit under § 8103 of the MTCA. 14 M.R.S.A. § 8103(1). This immunity, however, is subject to four narrow exceptions. *Id.* at § 8104–A; *see Roy,* 42 F.3d at 696; *Moore,* 596 A.2d at 614. These exceptions relate to negligent acts resulting from: (1) the "[o]wnership, maintenance or use of vehicles, machinery and equipment," (2) "construction, operation or maintenance of any public building," (3) "[d]ischarge of pollutants," and (4) "[r]oad construction, street cleaning or repair." 14 M.R.S.A. § 8104–A. None of these exceptions apply to the instant circumstances. Furthermore, under the MTCA "governmental entities are immune for the performance of an employee's discretionary function under section 8014–B." *Jackson v. Inhabitants of Town of Sanford,* 1994 WL 589617, *3 (D.Me.).[17]

■ Generally a governmental agency waives its immunity under the Act by procuring liability insurance. *See* 14 M.R.S.A. § 8116; *see also McLain,* 847 F.Supp. at 980 (while § 8103 of the MTCA provides immunity from suit, § 8116 of the Act overrides that immunity to the extent that the municipality has obtained insurance which covers areas where the municipality would otherwise be immune). Pittsfield does maintain liability insurance as a member of the Maine Municipal Association Property & Casualty Risk Pool, however, this insurance does not cover the alleged transgressions. (Dogherty Aff., ¶¶ 1–5); (Guerette Aff., ¶¶ 1–4.) Pittsfield's "Certificate of Participation" in the Maine Municipal Association Property & Casualty Risk Pool states:

> Coverage is limited to those areas to which governmental immunity has been express-

---

**16.** The contours of discretionary immunity under the MTCA differ from qualified immunity under 42 U.S.C. § 1983. *See Maguire,* 783 F.Supp. at 1487; *McPherson v. Auger,* 842 F.Supp. 25, 28, 30 (D.Me.1994).

**17.** Section 8104–B reads, in relevant part:
Notwithstanding section 8104–A, a governmental entity is not liable for any claim which

results from: . . . Performing or failing to perform a discretionary function or duty, whether or not the discretion is abused and whether or not any statute, charter, ordinance, order, resolution or policy under which the discretionary function or duty is performed is valid or invalid.
14 M.R.S.A. § 8104–B.

ly waived by 14 M.R.S.A. § 8101–A, as limited by 14 M.R.S.A. § 8104–B, and 14 M.R.S.A. § 8111 ... Liability coverage shall not be deemed a waiver of any immunities or limitations of damages available under the Maine Tort Claims Act, other Maine statutory law, judicial precedent, or common law.

(Maine Municipal Association Property & Casualty Pool Member Coverage Certificate, Town of Pittsfield, Cert. No. RP–2524012). Consequently, Pittsfield has not waived its immunity under § 8116, and the Court concludes as a matter of law that the Town of Pittsfield is immune from suit under the MTCA. *See Jackson,* 1994 WL 589617 at 3 (town immune from suit despite insurance under the Maine Municipal Association Risk Pool because it did not obtained liability insurance for violations of state law for which it would be entitled to immunity under the MTCA).

### VI. Punitive Damages

 Lastly, Defendants move for summary judgment on Comfort's state and federal punitive damages claims. Under federal law, punitive damages are available in a § 1983 action upon a jury finding that Defendants acted with "reckless or callous disregard for the plaintiff's rights [or an] intentional violation[ ] of federal law." *Smith v. Wade,* 461 U.S. 30, 51, 103 S.Ct. 1625, 1637, 75 L.Ed.2d 632 (1983); *see Davet v. Maccarone,* 973 F.2d 22, 27 (1st Cir.1992). In Maine, punitive damages are available upon a showing that the defendant acted with malice. *Tuttle v. Raymond,* 494 A.2d 1353, 1361 (Me.1985); *see Werman v. Malone,* 750 F.Supp. 21, 24 (D.Me.1990). The possibility exists under the facts alleged that a jury could find that the conduct of both Chief Lawrence and the individual officers satisfies these standards. Accordingly, the Court denies Defendants' Motion for Summary Judgment as to all counts for punitive damages relative to the individual Defendants.

 Punitive damages, however, are not available under § 1983 on a theory of munici-

pal liability. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981). The Court need not address the issue of punitive damages under the MTCA or the Maine Civil Rights Act, as no claims against Pittsfield remain as to either act.[18] The Court grants Pittsfield's Motion for Summary Judgment on the punitive damages claim.

### VII. Conclusion

Rule 56 of the Federal Rules of Civil Procedure allows for summary judgment in the absence of genuine issues of material fact, when the moving party is entitled to judgment as a matter of law. In the present case, factual disputes persist, and summary judgment on most claims is therefore inappropriate.

The Court:

(1) DENIES Defendants' Motion for Summary Judgment as it relates to the Count I Fourth Amendment claim and the related conspiracy claim;

(2) GRANTS Defendants' Motion for Summary Judgment on the Count I First and Fifth Amendment (or Fourteenth Amendment) claims;

(3) DENIES Defendants' Motion for Summary Judgment as to the Count II Fourth Amendment claim under the Maine Civil Rights Act, but GRANTS summary judgment as to the Fifth Amendment claims as well as the claims under Article 1 §§ 1, 6, 6–A under the Maine Constitution;

(4) DENIES Defendants' Motion for Summary Judgment on Plaintiff's Count II statutory claims under 15 M.R.S.A. § 704, 17 M.R.S.A. § 2931 and 17–A M.R.S.A. § 107–108;

(5) DENIES Defendants' Motion for Summary Judgment on the Count III claims for assault, battery and intentional infliction of emotional distress, and the Count VI negligence claim;

(6) DENIES Defendant's Motion for Summary Judgment on the Count IV negli-

---

18. Even to the extent that claims remained under either act, punitive damages are not available

against Pittsfield.

gent failure to train claim against the Town of Pittsfield to the extent that this claim is construed as a § 1983 claim (Count IV), but GRANTS summary judgment on any common law negligence claims against Pittsfield;

and

(7) DENIES Defendant's Motion for Summary Judgment on the Count V claim for negligent failure to train and supervise by Chief Lawrence, both as to § 1983 liability and any common law negligence claims.

*It is so ordered.*