**Donna WHITE, Plaintiff**

v.

**Mark TAMLYN, Michael Harris, Richard Holme, Richard Pierce, Dwayne Crawford, Lil Jon Drew, Robert A. Ficano, The County of Wayne, and The Wayne County Sheriff's Department, Defendants.**

**Civil Action No. 96–CV–40097.**

United States District Court,
E.D. Michigan,
Southern Division.

March 31, 1997.

---

Leland T. Schmidt, Montagne, Schmidt, Southfield, for Donna White.

Margaret A. Nelson, Michigan Department of Attorney General, Tort Defense Division, Lansing, for Mark Tamlyn, Michael Harris, Dwayne Crawford, Lil Jon Drew.

Robert S. Gazall, Wayne County Corp. Counsel, Detroit, for Richard Holme, Richard Pierce, Robert A. Ficano, County of Wayne, Wayne County Sheriff's Department.

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

GADOLA, District Judge.

On December 21, 1995, plaintiff Donna White filed the instant case against defendants Mark Tamlyn, Michael Harris, Richard Holme, Richard Pierce, Dwayne Crawford, Lil Jon Drew, Robert A. Ficano, County of Wayne and Wayne County Sheriff's Department alleging, *inter alia*, violations of her civil rights under 42 U.S.C. § 1983. The case was removed to this court pursuant to 28 U.S.C. 1331, 1441 on March 7, 1996. Presently before this court are two motions for summary judgment. The first motion was filed on January 15, 1997 by defendants Wayne County, Wayne County Sheriff's Department, Ficano, Pierce and Holme. The second was filed on January 17, 1997 by defendants Tamlyn, Harris, Crawford and Drew. For the following reasons, defendants' motions will be granted in part and denied in part.

### FACTS [1]

On December 23, 1993, at approximately 3:30 p.m., undercover Wayne County Sheriff Deputies Pierce and Holme observed "Gangster," a known narcotics dealer, conducting a drug purchase on the east side of John R. Street, south of Alfred Street with two occupants of a green Mercury Cougar. Pierce and Holme pulled behind the suspect vehicle and exited their unmarked car. Pierce approached on the driver side and observed the driver and passenger smoking from a crack pipe. Pierce knocked on the driver side window and identified himself as a police officer. The driver of the vehicle placed the car in gear and sped away dragging Holme approximately 15–20 feet. Pierce picked up Holme and proceeded after the suspect vehicle.

Deputies Pierce and Holme followed the Cougar west on Alfred Street at which time the driver eluded Pierce and Holme. Shortly thereafter, the Mercury Cougar was observed turning west on Temple from northbound Cass Street. The deputies activated their blue strobe light and siren, and followed the suspect's vehicle to the Lodge Freeway. At this time, Pierce and Holme noted the license plate number and radioed their dispatcher for assistance. In their call to Wayne County Metro Dispatch for help, the Deputies gave a general description of the vehicle, stating that the vehicle was a green Mercury with two male suspects.

The Mercury Cougar proceeded north on the Lodge and exited westbound on the Ford expressway (I–94), quickly changing lanes without signaling. The vehicle then exited from I–94, crossed the street adjacent to the exit, and re-entered the expressway at Southfield Road.[2]

As the Cougar re-entered the expressway at Southfield,[3] one police car approached on

---

1. The factual recitations provided by plaintiff and defendants in their briefs diverge at times. For purposes of deciding defendants' motions for summary judgment, this court accepts plaintiff's version of the facts as true.

2. Although not set forth in her brief, a review of plaintiff's deposition testimony reveals that she denies being involved in the pursuit until her car entered the I–94 freeway at Southfield Road. Plaintiff testified that the chain of events leading up to her entry on I–94 were as follows: she left her home at 2:20, stopped at Mike's Party Store, stopped at the Sunoco gasoline station, traveled eastbound on Ford Road to Southfield, then proceeded south on Southfield to Michigan Avenue. Next, she drove west on Michigan Avenue to Outer Drive, turned eastbound on Outer Drive, stopped at F & M drugstore, re-entered her vehicle and continued eastbound on Outer Drive to Southfield Road. Eventually she cruised south on Southfield Road to I–94 where she was met by the police. The issue of her alibi was fully and fairly litigated at her criminal trial, and thus she is collaterally estopped from arguing it in this case.

3. Defendants contend that she re-entered the expressway at Oakwood Boulevard, not Southfield.

the right and another on the left side of the Cougar. The squad car to the Cougar's left gestured the suspect to pull over. Sirens were activated on both vehicles. Then, a third police car passed the police vehicle to the left of the Cougar and proceeded to pull in front of the Cougar. At this point in time, the suspect's car struck the police car on the left. The force of this collision propelled the Cougar into the police vehicle on the right.[4]

After the collision, Michigan State Troopers Tamlyn, Harris, Crawford and Drew, who had been riding in the scout cars involved in the collision, approached the Cougar and ordered the suspect (hereinafter "plaintiff") out of the vehicle. Crawford, Harris and Drew had their weapons drawn. Deputies Pierce and Holme, who had kept a distance during the chase, pulled up to the scene and stopped some feet behind the other police vehicles, drew their weapons and took up positions near their own car. As Drew moved around the rear of the Cougar to the passenger side, he observed the plaintiff cranking the key in the ignition attempting to start the vehicle. Crawford broke out the front of the passenger window with the butt of the rifle he was carrying, and the window shattered.

Tamlyn had by this time opened the driver's door. A dog then exited the vehicle and ran between Crawford's legs and across the freeway. Thereafter, according to the plaintiff, she was thrown out of her vehicle to the ground and hand-cuffed. She asserts that after being handcuffed, an officer sat on her back and another officer had a knee holding her face down, and that CS tear gas was then applied to her face. Plaintiff claims that, while blinded and unable to see, she received blows to her vaginal area. She asserts that, due to the prowess of the officers restraining her and as a result of the visual blinding that she suffered from the gas, she could not identify any of the officers who carried out these actions. She denies resisting arrest.[5]

After being handcuffed, plaintiff was escorted to a patrol vehicle and patted down.

---

**4.** The defendants recall the chase differently. According to defendants, this is the sequence of events which ensued after plaintiff re-entered I-94: Michigan State Police Troopers Crawford and Drew were along side the entrance ramp at I-94 in a marked State Police vehicle. Deputies Pierce and Holme gestured toward the suspect vehicle to identify it to Troopers Crawford and Drew. Troopers Crawford and Drew then passed Deputies Pierce and Holme, placing their vehicle between the Cougar and the Pierce/Holme vehicle. From that point forward, Pierce and Holme fell back several car lengths, and remained 150 yards behind the Cougar during the ensuing chase. Shortly thereafter, Michigan State Troopers Tamlyn and Harris also arrived in a marked vehicle and pulled behind the Crawford/Drew vehicle. Both activated their sirens and strobes in an effort to get the vehicle to stop. Ultimately, the Tamlyn/Harris vehicle pulled in front of the suspect vehicle. So, at this point in the pursuit the Tamlyn/Harris squad car was in the lead, the Cougar in the middle and the Crawford/Drew vehicle at the front.

The suspect vehicle was weaving in and out of traffic, erratically changing lanes. The Tamlyn/Harris car would mirror the lane changes of the Cougar in an attempt to stay in front of it. The suspect vehicle next attempted to negotiate an emergency turn-around, missed and spun out. Crawford/Drew pulled in behind. The driver of the Cougar put the car in reverse, struck the Crawford/Drew vehicle, then drove away at a right angle across the traffic lanes. Thereafter, while back in traffic, the suspect vehicle attempted to pull between the Tamlyn/Harris car and a semi-truck. In so attempting, it struck the semi and collided with the right rear passenger side of the Tamlyn/Harris vehicle near the tire (not necessarily in that order). The Cougar spun out, hit the Crawford/Drew car, spun out again and then hit the Crawford/Drew vehicle again. Upon impact with the Cougar, the Tamlyn/Harris car went sideways and slid right into the front of a semi-truck. It was dragged for some distance until it was disengaged from the truck.

**5.** Not surprisingly, the defendants relate a different version of the facts. After the car door was open and plaintiff was removed from the vehicle, the defendants assert that the next thing that occurred was a struggle between plaintiff and Tamlyn. Plaintiff was combative—lying on her back, flailing her arms and legs. Tamlyn was straddling her, trying to control her arms. To control her legs, Harris approached the plaintiff's left side and then attempted to strike her in the common peroneal (a nerve on the outside of the leg above the knee) with his shin. (This peroneal kick was not admitted to by Harris when testifying at the criminal trial but only during his deposition). Then, Harris came around the other side of plaintiff and sprayed gas repellent in plaintiff's face, to which she did not respond. Eventually, Tamlyn managed to roll the plaintiff over and handcuff her. Not one of the officers present at the scene admits to administering blows to plaintiff's vaginal area, nor do any of the officers on the scene recall a strike being inflicted on plaintiff's vaginal area by any of the other officers.

It was determined at that time that she was female. Deputy Pierce conducted an inventory search of her car and found a marijuana cigarette, a small bag of suspected crack cocaine and a home-made crack pipe.

An EMS unit was called to the scene, and upon arrival flushed plaintiff's face in order to remove the gas repellant. *EMS* personnel observed what they believed to be a broken nose requiring medical attention and plaintiff was transported to Detroit Receiving Hospital. In the ambulance and at Detroit Receiving Hospital, plaintiff complained of pain in her vaginal area. She was examined and injuries to her vagina and genitalia were discovered. Plaintiff was thereafter transported to Hutzel Hospital and the lesions to her vaginal area were confirmed.

At Hutzel Hospital, Deputy Holme conducted a search of plaintiff's clothes and found two small plastic bags containing cocaine and one crack pipe screen.[6] Neither he nor Pierce, however, obtained a search warrant to test plaintiff's blood for drugs. Ultimately, after receiving treatment at both Detroit Receiving and Hutzel medical centers, plaintiff was transported to the Wayne County Jail.

Plaintiff was charged with possession of cocaine, a felony, and possession of marijuana, a felony. At her criminal trial, she asserted three defenses. First she argued that the police erroneously identified both her and her vehicle. Second, she introduced an alibi defense. Third, plaintiff contended that the police illegally beat her and that they fabricated and planted physical evidence on her in order to cover up their mistake in arresting her and their own illegal acts. The jury ultimately convicted plaintiff on both controlled substance counts.

On December 21, 1995, plaintiff brought a suit against Deputies Pierce and Holme, Wayne County Sheriffs Department, County of Wayne, Sheriff Robert A. Ficano, as well as Michigan State Troopers Tamlyn, Harris, Crawford and Drew, alleging violations of 42 U.S.C. § 1983. Specifically, she claims that her Fourth and Fourteenth Amendment rights have been violated for the following

reasons: the police used excessive force during the high speed chase and during the arrest, that she was arrested without probable cause, that she was falsely imprisoned, that the police filed false reports, and that the officers falsely testified in hearings before the court during the criminal trial.

Presently before the court are two summary judgment motions. The first motion was filed by defendants County of Wayne, Wayne County Sheriffs Department, Ficano, Holme and Pierce on January 15, 1997 ("County motion"). The second was filed by Tamlyn, Harris, Crawford and Drew on January 17, 1997 ("Michigan State Police motion"). Each motion will be addressed *seriatim.*

## ANALYSIS

### I. SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue of material fact when the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.*, 25 F.3d 1320, 1323 (6th Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)). "The mere existence of some alleged factual dispute between the parties will not defeat the otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at

---

6. Plaintiff argues that defendants could not have found any contraband in her pockets because

according to her, they were emptied at the scene of the arrest.

2510. In deciding a motion for summary judgment, the court must consider all evidence together with all inferences to be drawn therefrom "in light most favorable to the party opposing the motion." *Watkins v. Northwestern Ohio Tractor Pullers Ass'n, Inc.,* 630 F.2d 1155, 1158 (6th Cir.1980).

If the movant meets the standard specified at Rule 56(c), then the opposing party must come forth with "specific facts showing that there is a genuine issue for trial." *First National Bank v. Cities Serv. Co.,* 391 U.S. 253, 270, 88 S.Ct. 1575, 1583, 20 L.Ed.2d 569 (1968) Fed.R.Civ.P. 56(e). The non-moving party "is not entitled to a trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Kraft v. United States,* 991 F.2d 292, 296 (6th Cir.1993), *cert. denied,* 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993); *Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 861 (6th Cir.1986). And, "if the adverse party does not respond, summary judgment, if appropriate shall be entered against the adverse party." Fed.R.Civ.P. 56(e); *Rizzo v. Goode,* 423 U.S. 362, 370–71, 96 S.Ct. 598, 603–04, 46 L.Ed.2d 561 (1976); *O'Hara v. Wigginton,* 24 F.3d 823, 826–27 (6th Cir. 1994).

### II. 42 U.S.C. § 1983

Plaintiff brings all claims in the case under Title 42, section 1983 of the United States Code, which provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

By the plain terms of 42 U.S.C. § 1983, proof of two elements is required in order to state a cause of action under that statute. First, the plaintiff must establish that some person has deprived him or her of a federal right. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254–55, 101 L.Ed.2d 40 (1988).

Second, plaintiff must demonstrate that the person who deprived him or her of that right acted under color of state or territorial law. *Id. See also Enertech Electrical, Inc. v. Mahoning County Com'rs,* 85 F.3d 257, 259–260 (6th Cir.1996); *United of Omaha Life Ins. Co. v. Solomon,* 960 F.2d 31, 33 (6th Cir. 1992).

### III. MICHIGAN STATE POLICE MOTION FOR SUMMARY JUDGMENT

Plaintiff's complaint alleges that defendants Tamlyn, Harris, Crawford and Drew (collectively "Michigan State Police") acted under color of state law to deprive plaintiff of her constitutional rights under the Fourth and Fourteenth Amendment in violation of 42 U.S.C. § 1983. She premises her civil rights claim on allegations of excessive force in her apprehension and arrest, arrest without probable cause, false imprisonment, filing of false police reports and providing false testimony during her criminal trial. The Michigan State Police argue that they are entitled to summary judgment with respect to all these § 1983 claims. First, the Michigan State Police insist that plaintiff is collaterally estopped from litigating the issues of arrest without probable cause, false imprisonment, excessive force in arrest, filing false police reports, and falsely testifying at hearings in the criminal trial. Second, these four defendants maintain that plaintiff's § 1983 claim relating to the high speed chase fails because the pursuit did not constitute a "seizure" within the meaning of the Fourth Amendment. Lastly, the Michigan State Police argue that, even assuming plaintiff is not collaterally estopped from litigating the issue of excessive force in arrest, the force applied in the effectuation of her arrest was reasonable, and did not amount to a constitutional violation.

### A. Whether Collateral Estoppel Precludes Plaintiff From Litigating the Issues of Arrest Without Probable Cause, False Imprisonment, Use of Excessive Force, Filing of False Police Reports, and the Giving of False Testimony

The Michigan State Police first contend that plaintiff is collaterally estopped from

asserting the majority of her claims. For one, they argue that the issue of probable cause and misidentification were adjudicated at a preliminary examination as well as at trial in the underlying criminal case, and therefore this court should bar plaintiff from attempting to relitigate them in this action.[7] The Michigan State Police also argue that plaintiff is collaterally estopped from litigating the issue of whether they used excessive force in her arrest because this issue was raised and thoroughly argued by her defense attorney, Laurence H. Peppler, in the criminal trial. Lastly, these four defendants insist that plaintiff is estopped from bringing a claim of filing false reports and perjury, because such issues relate to the credibility of the police officers and were necessarily contingent to a finding of probable cause to arrest, as well as her subsequent conviction.

### 1. Collateral Estoppel

■ "It is established that a prior criminal conviction may work an estoppel in a subsequent civil proceeding." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980); *Emich Motors v. General Motors Corp.,* 340 U.S. 558, 568–569, 71 S.Ct. 408, 414, 95 L.Ed. 534 (1951). Federal courts must look to state law in determining what preclusive effect should be given a prior state court decision. *Migra v. Warren City School Dist. Bd. of Educ.,* 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). Under Michigan law, collateral estoppel "precludes relitigation of an issue in a subsequent, different cause of action between the same parties when the prior proceeding culminated in a valid judgment and the issue was actually

and necessarily determined in the prior proceeding." *Bullock v. Huster,* 209 Mich.App. 551, 556, 532 N.W.2d 202 (1995) (*citing Schlumm v. Terrence J. O'Hagan, P.C.,* 173 Mich.App. 345, 354, 433 N.W.2d 839 (1988)).[8] It may not be clear whether an issue was actually and necessarily determined in a prior proceeding, as when a general verdict does not indicate exactly what matters were adjudicated in the antecedent suit. *Allen,* 340 U.S. at 578–59. In such cases, the trial judge should examine the record, as well as the evidence submitted and the jury instructions, to determine what issues were previously decided. *Id.*

### 2. Arrest Lacking Probable Cause and False Imprisonment

■ Plaintiff is collaterally estopped in this civil rights case from arguing that she was arrested without probable cause in violation of the Fourteenth Amendment. At a preliminary examination, which is an adversary proceeding under Michigan law, *People v. Johnson,* 8 Mich.App. 462, 466, 154 N.W.2d 671 (1967), plaintiff contested the issue of probable cause. She was represented by counsel, who cross-examined witnesses produced by the prosecution. At the conclusion of the preliminary examination, the district judge found probable cause to believe that a felony had been committed and that plaintiff committed it. Under these circumstances, since plaintiff had a "full and fair opportunity" to litigate the issue of probable cause for her arrest at the prior state proceeding, she is collaterally estopped from doing so here. *Coogan v. City of Wixom,* 820 F.2d 170, 175

---

7. At her criminal trial, plaintiff asserted the alibi that she was not at the location of the suspected drug buy, was not the driver of the car chased by the officers from the location of the drug buy and was the wrong person pursued by the Michigan State Police Troopers. These four defendants insist that plaintiff is barred from raising any factual issues surrounding the alibi defense which was fully and fairly litigated in the criminal trial. It is not clear whether plaintiff is attempting to litigate this issue. If so, she is collaterally estopped from doing so because this issue was fully litigated by her attorney and placed before the jury at the criminal trial and the jury rejected it.

8. Under federal collateral estoppel rules, four specific requirements must be satisfied in order to bar litigation of an issue:

(1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding;

(2) determination of the issue must have been necessary to the outcome of the prior proceeding;

(3) the prior proceeding must have resulted in a final judgment on the merits; and

(4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*N.A.A.C.P., Detroit Branch v. Detroit Police Officers Ass'n.,* 821 F.2d 328, 330 (6th Cir.1987).

(6th Cir.1987) (holding that plaintiff in a § 1983 lawsuit was collaterally estopped from litigating the issue of probable cause to arrest since it was fully explored at a criminal examination whereupon plaintiff was bound over for trial).

 Her criminal conviction also bars her from asserting a claim of false imprisonment. An essential element of a false imprisonment claim is that there was an arrest' without probable cause. *Brewer v. Perrin,* 132 Mich.App. 520, 527, 349 N.W.2d 198 (1984) (in order to prevail on false imprisonment claim, plaintiff must show her arrest lacked probable cause). Since plaintiff is collaterally estopped from arguing that the Michigan State Police lacked probable cause to arrest her, she cannot prove an essential element of her § 1983 false imprisonment claim. It too, fails as a matter of law.

 A separate and related reason for precluding plaintiff from bringing claims of false arrest and false imprisonment under § 1983 is that under long-established common law principles, plaintiff's conviction gives the defendant police officers a complete defense. "[T]he common-law rule, equally applicable to actions [under § 1983] asserting false arrest, false imprisonment, or malicious prosecution, was and is that the plaintiff can under no circumstances recover if [s]he was convicted of the offense for which [s]he was arrested." *Cameron v. Fogarty,* 806 F.2d 380, 387 (2nd Cir.1986), *cert. denied,* 481 U.S. 1016, 107 S.Ct. 1894, 95 L.Ed.2d 501 (1987). *See also Walker v. Schaeffer,* 854 F.2d 138, 142 (6th Cir.1988) ("agreeing" with the conclusion in *Cameron* that "where law enforcement officers have made an arrest, the resulting conviction is a defense to a § 1983 action asserting that the arrest was made without probable cause").

### 3. Excessive Force in Arrest

 As for plaintiff's claim of excessive force in arrest, plaintiff is not collaterally estopped from bringing such an allegation. In plaintiff's criminal trial for possession of marijuana and cocaine, plaintiff asserted, as one of her defenses, that the credibility of the police officers who were present at the scene of her arrest was questionable due to the fact that they had used an unreasonable amount of force in perfecting her arrest. Specifically, plaintiff argued that the police illegally beat her in the vaginal area and attempted to cover up this conduct by planting drugs on her. No medical testimony was admitted regarding the alleged injuries. However, pictures taken on December 25, 1993 by Liesha Neigebauer, plaintiff's roommate, and Betty Neigebauer, Liesha's mother, graphically depicting abrasions to plaintiff's vaginal area were published to the jury. Also, medical records from Detroit Receiving and Hutzel hospitals confirming that plaintiff sustained injuries to her vagina were shown to the jury at the criminal trial. At the close of the criminal case, the judge gave the following instruction regarding the relevancy of the evidence introduced by the defendant pertaining to her vaginal injuries:

I instruct you that if you find beyond a reasonable doubt that the defendant intentionally and knowingly possessed cocaine in count one and/or marijuana in count two, she would be guilty of such offenses respectively even if the police officers illegally injured her. Do you all understand that?

The judge further advised the trier of fact as follows:

Mr. Peppler [defense counsel] contends very vociferously that a whole big mistake was made in this case and that they got the wrong person, and that after she had been hit or beat they fabricated evidence against her, the evidence that you saw admitted on several different exhibits, but particularly the cocaine and the marijuana on People's Exhibits 4 and 5. That evidence is in this case only because of the nature of the defense, okay? In other words, it bears upon the credibility of the police testimony in this case. Okay? And so that's why all of that evidence came in.

*But strictly speaking, it is not directly material because she would be guilty or not guilty of intentionally possessing cocaine and/or marijuana regardless of whether a beating was suffered or not, right? I mean, either she did it or she didn't do it. And whether she was beaten*

or not strictly speaking is not directly material to whether she did or didn't do it with respect to the cocaine or marijuana. But we allow it into evidence because of her claim that the police officers are lying and they fabricated the evidence against her that she never possessed any such evidence.

(emphasis added).

The Michigan State Police strenuously contend that the issue of excessive force was both material and actually decided by the jury in the prior criminal proceeding, and therefore plaintiff is now estopped from raising it again in this civil rights case. The Michigan State Police seem to think that in order for the jurors to have convicted plaintiff at the criminal trial, they would have had to believe *all* the police officers' testimony, including their rendition of the facts as to whether needless force was applied to plaintiff. Specifically, they insist that in order to find that the police did not plant drugs, the jury would also have to find that they did not use excessive force. Yet, this is not so. The jurors who convicted plaintiff could have disbelieved the officers' denials of delivering blows to her in her vaginal area, but still found that they did not fabricate evidence and returned a verdict of guilty on the charges of possession of controlled substances. Indeed, they could have found that the officers beat her profusely, The judge was careful in his instructions to the jury to separate the issues of excessive force and possession. She told the jurors that they could find her "guilty or not guilty of intentionally possessing cocaine and/or marijuana *regardless of whether a beating was suffered.*" In fact, the judge went so far as to say that the issue of police brutality was not "directly material" to her guilt. Consequently, because the jurors never made a finding with respect to the issue of excessive force, collateral estoppel does not bar plaintiff from litigating this in the case *sub judice.*

In short, this court disagrees with the Michigan State Police as to whether plaintiff is collaterally estopped from litigating her claim of excessive force. It is clear from the record that the issue of excessive force was distinctly put in issue at the criminal trial, but not necessarily decided. The jury instructions plainly reveal that at no time during that criminal trial did the jury have to ultimately decide the issue of whether the police used unreasonable force in perfecting plaintiff's arrest. They did have to decide, however, the issue of whether the police fabricated evidence against her. Consequently, plaintiff is collaterally estopped from litigating that issue here.

### 4. Filing False Police Reports and Testifying Falsely

The Michigan State Police likewise rely on collateral estoppel to preclude plaintiff from arguing the issues of filing false police reports and testifying falsely at trial. Yet, this court will dismiss these two allegations on different grounds.

First, as to the filing of false reports, plaintiff has no cause of action under § 1983. Plaintiff claims that the officers filed reports which did not detail the alleged abuse and tear gassing she sustained during her arrest. As a result, the Michigan State Police officers' supervisor, Sergeant Billmeyer did not know gas repellent was utilized. Plaintiff's claim fails, however, since the filing of such reports alone does not itself deprive a person of a constitutional right under the Fourteenth Amendment. Such action only constitutes a due process violation when the falsified reports lead to an unconstitutional deprivation of life, liberty or property. *Landrigan v. City of Warwick,* 628 F.2d 736, 745 (1st Cir.1980) Here, plaintiff has not indicated how the alleged erroneous writing and filing of these reports deprived her of her life, liberty or property, and thus fails to identify any federal rights in jeopardy. The existence of these reports does not in and of itself violate any of her constitutional rights, and her § 1983 claim premised upon such an allegation is unavailing.[9] *Comfort v. Town of Pittsfield,* 924 F.Supp. 1219, 1230 (D.Me.1996). *See also*

---

**9.** Actually, it appears that plaintiff is trying to convert her Fourth Amendment charge of excessive force into another claim, that being a Four-

teenth Amendment cause of action for filing incomplete police reports.

*Bailey v. Tricolla*, No. 94–4597, 1995 WL 548714, at *5 (E.D.N.Y., Sept.12, 1995).

In regard to plaintiff's allegation that the Michigan State Police testified falsely at the criminal trial, absolute immunity clearly shields these four defendants from liability for such actions. In *Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), the Supreme Court held that all witnesses——police officers as well as lay witnesses—are absolutely immune from civil liability under 42 U.S.C. § 1983 based upon their testimony in judicial proceedings. *Id.* at 328. *See also Alioto v. City of Shively, Kentucky*, 835 F.2d 1173, 1174 (6th Cir.1987). This is so even if they knowingly gave perjured or incomplete testimony. E. Chemerinsky, *Federal Jurisdiction* § 8.6 (2nd ed.1994) ("the Supreme Court has held that police officers have absolute immunity for the testimony they give as witnesses, even if the police officers commit perjury"). Due to the cloak of absolute immunity, plaintiff's claim against the Michigan State Police regarding the giving of false testimony must be dismissed.

## B. Plaintiff's Fourth Amendment Claim of Unreasonable Seizure During the High Speed Chase

Plaintiff also claims that during the high-speed chase she was deprived of her constitutional right under the Fourth Amendment to be free from unreasonable seizures. Plaintiff argues that the vehicle pursuit was a moving road-block, which constituted a "seizure." She further asserts that during the alleged seizure, the police used unreasonable, and in fact "deadly force" causing her car to careen into a semi-truck. The Michigan State Police maintain that they are entitled to summary judgment on this claim because at no point in time during the vehicle chase or resulting crash was plaintiff seized, within the meaning of the Fourth Amendment, and therefore at no time was her Fourth Amendment right to be free from unreasonable seizures violated.

### 1. The Fourth Amendment

The Fourth Amendment does not safeguard a plaintiff from unreasonable or even outrageous conduct, in general. *Galas*

*v. McKee*, 801 F.2d 200, 202 (6th Cir.1986). In order to prevail on a claim alleging unreasonable seizure within the Fourth Amendment, plaintiff must first establish that there was a "seizure." The seminal case dealing with the issue of whether a person has been seized is *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), in which the Supreme Court held that "[w]henever an officer restrains the freedom of a person to walk away, he has seized that person." *Id.* at 7, 105 S.Ct. at 1699. This standard was refined in *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), a case involving a high-speed pursuit.

In *Brower*, plaintiff argued that she was unreasonably seized when a high-speed chase culminated in the death of a fleer. The police in that matter had undertaken a series of three steps designed to bring the chase to a halt. First, they allegedly caused an 18-wheel tractor-trailer to be placed across both lanes of a two-lane highway in Brower's path. Next, the officers effectively concealed this road-block by positioning it behind a curve and leaving it unilluminated. Lastly, the officers blinded Brower by placing a scout car with headlights on, between Brower's vehicle and the truck.

The Supreme Court found that plaintiff had been seized within the meaning of the Fourth Amendment because police intended to stop Brower through means of a collision with a physical obstacle. The Court explained:

> It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a government termination of freedom of movement *through means intentionally applied.*

*Id.* at 596–97, 109 S.Ct. at 1381 (emphasis added). Thus, in order to establish a seizure in the context of high-speed pursuits, *Brower* requires that officers must have intended a

collision to occur to terminate the pursuit. *Horta v. Sullivan,* 4 F.3d 2, 10 (1st Cir., 1993). The Court was cautious to limit the holding in *Brower* by distinguishing the facts before it from a case where a fleer unexpectedly loses control of his car and crashes. If the police seek to stop a suspect only by show of authority, i.e. by means of flashing lights, siren and continuing pursuit, and the stop occurs as the result of the suspect's actions, i.e. loss of control and crashing, then the Supreme Court observed that no seizure within the Fourth Amendment occurs and no cause of action will lie. *Id.* at 597, 109 S.Ct. at 1381–82. It is only when police take specific, intended conduct causing the suspect to crash, that the termination of the suspect's freedom is a seizure. *Id.*

The case of *Galas v. McKee,* 801 F.2d 200 (6th Cir.1986), is illustrative of a high-speed chase which did not constitute a seizure. In that case, an officer had observed a vehicle, an Oldsmobile, traveling well in excess of the speed limit. The officer activated the blue lights and siren on the police motorcycle and signaled the driver to pull over and stop. The driver of the Oldsmobile accelerated rather than stop and a high-speed chase followed. The pursuit reached speeds upwards of 100 miles an hour, and ultimately the driver of the Oldsmobile lost control of his automobile and crashed. The Sixth Circuit held that at the initial stages of the pursuit, plaintiff was not restrained at all. Hence, no seizure occurred. During the latter stages, his freedom was restrained via a collision, but that the crash resulted totally from plaintiff's conscious decision to disregard authority and so even then, no seizure occurred. *See also Horta v. Sullivan,* 4 F.3d 2, 11 (1st Cir.1993) (finding no seizure in an officer's pursuit of a motorcycle because there was no genuine issue of material fact as to whether motorcycle-police cruiser collision was the means intended by the officer to terminate plaintiff's freedom of movement); *Montgomery v. County of Clinton, Michigan,* 743 F.Supp. 1253, 1256–57 (W.D.Mich.1990) (holding that police use of force incidental to high speed chase did not amount to a seizure when plaintiff crashed with utility pole as a result of his own actions), *aff'd.* 940 F.2d 661 (6th Cir.1991).

## 2. The High–Speed Chase

 The facts of this case clearly warrant the conclusion that there was no seizure within the meaning of the Fourth Amendment under plaintiff's version of the facts. Plaintiff testified at her deposition that she was traveling down I–94 with one police car to her right side and one to her left. Their sirens were activated and the police car to the left of her gestured her to pull over. Then, a third police car "all of a sudden" came up on plaintiff's left, passed the other police car already on her left and pulled in front of plaintiff. When the third police car came up and passed her on the left, she struck it. After striking the police car on her left, she bounced off that car and hit the police cruiser to her right and came to a stop.

This court does not agree with plaintiff's characterization of this pursuit as a seizure by way of a moving roadblock. Rather, this court finds that the Michigan State Police were only seeking to stop the suspect through a display of authority, using their flashers and sirens and giving her gestures to halt. There was a possibility that a stop by physical impact could have occurred, yet the so-called "rolling roadblock" maintained by the Michigan State Police vehicles was not designed to cause a physical impact. If plaintiff slowed her vehicle and submitted to the authority of the police, a collision would have certainly been avoided.[10] Particularly significant is the fact that plaintiff did not see the police car in front of her braking to slow down. If she had witnessed this, then the reasonable inference from such conduct would be that the officers in front of her intended for her to crash into them. But there is no evidence of an intent to stop plaintiff through physical impact. *Brower v. County of Inyo,* 489 U.S. at 597, 109 S.Ct. at 1381–82. *See also Carter v. Lucas ,* Civ. No. 93–1804, 1994 WL 378041, at *3 (4th Cir. July 20, 1994) (per curiam), in which the court held that a "rolling roadblock" was not

---

**10.** Prior to the collision, there was definitely no seizure. Plaintiff was moving at all times prior to the crash, and never subjected herself the show of authority.

a seizure but merely a "strong show of authority." Furthermore, there is no evidence of any intent to run the plaintiff off the road. The vehicle in front of plaintiff was changing lanes, but in so doing the intent of the officers in that car was not to force plaintiff off the road or ram into the plaintiff. It is crystal clear that the officers were simply trying to mirror plaintiff's incessant swerving pattern in order to stay in front of her.

Plaintiff mischaracterizes the testimony of Harris in an effort to create a genuine issue of material fact. Plaintiff argues that Harris testified that the Harris/Tamlyn vehicle, which was in front of the plaintiff's vehicle, turned right in an effort to cut plaintiff off and cause her to crash. However, Trooper Harris did not testify to this rendition of the facts. Harris stated that the Harris/Tamlyn cruiser was a half a car length in front of plaintiff's Cougar and that it was attempting to mirror all the erratic lane changes plaintiff was making. If plaintiff veered to the right, so would the Harris/Tamlyn vehicle, and vice-versa. At one point in the chase, plaintiff turned to the right and the Harris/Tamlyn vehicle also swerved to the right, mimicking her lane change. Plaintiff then accelerated in an effort to pass the Harris/Tamlyn car and collided with Harris/Tamlyn's passenger side, rear wheel area when it was still moving to the right. At no time did Harris/Tamlyn intend to forcibly end the chase by turning into her, as plaintiff suggests. Rather, Harris' testimony is that plaintiff accelerated, of her own accord, attempted to pass the police vehicle in from of her, and in so doing, crashed into the Harris/Tamlyn vehicle while it was merely mirroring her lane changes.

Plaintiff also mischaracterizes the testimony of her so-called expert, Robert J. DiGrazia. According to plaintiff, DiGrazia testified that the Harris/Tamlyn vehicle was trying to "ram" into the plaintiff's vehicle, or at the very least, push plaintiff's car into a semi-truck. DiGrazia made no such assertion. His testimony was that neither Harris nor Tamlyn were aware of the semi, so they could not have intended on propelling her into the same. He further testified that "there was no doubt" that it was plaintiff's

choice to try to squeeze through a space between the squad car and the semi-truck in front of her, in an effort to pass by the police. The crash was of her own making, and under *Brower* does not amount to a seizure under the Fourth Amendment of the Constitution of the United States of America.

In sum, the Michigan State Police have shown that there is no genuine issue of material fact as to whether the high-speed chase constituted a seizure, within the meaning of the Fourth Amendment. Since no right secured by the Fourth Amendment was violated, plaintiff's 42 U.S.C. § 1983 claim based on such a right must fail.

## C. Excessive Force in Arrest

This court has determined that plaintiff is not collaterally estopped from bringing a Fourth Amendment claim of unreasonable force in her arrest. The Michigan State Police offer an alternative argument as to why plaintiff has no viable § 1983 claim with respect to this allegation, contending that there is no genuine issue of material fact that the arrest was unreasonable.

### 1. The Legal Standard for Judging the Reasonableness of the Force Used in Perfecting an Arrest

 "All claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Montgomery v. County of Clinton, Michigan,* 743 F.Supp. 1253, 1255–56 (W.D.Mich.1990) (*citing Graham v. Connor,* 490 U.S. 386, 394–95, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989)), *aff'd.* 940 F.2d 661 (6th Cir.1991). *See also Pleasant v. Zamieski,* 895 F.2d 272, 275 (6th Cir.), *cert. denied,* 498 U.S. 851, 111 S.Ct. 144, 112 L.Ed.2d 110 (1990). The relevant inquiry is whether the officers used more force than was reasonably necessary to make the arrest. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S.

at 396, 109 S.Ct. at 1872. Factors to consider are (1) the severity of the crime; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest or attempting to flee. *Ford v. Retter,* 840 F.Supp. 489, 491 (N.D.Ohio 1993) (*citing Graham,* 490 U.S. at 396, 109 S.Ct. at 1871–72).

## 2. The Arrest by the Michigan State Police

The Michigan State Police contend that the force used in accomplishing plaintiff's arrest was objectively reasonable. They argue that the peroneal kick to knee, administered by Harris, was a non-deadly, commonly-used pressure point tactic, which was reasonable to resort to under the circumstances, given that plaintiff was kicking ferociously and was resisting arrest. According to a Pressure Point Control Technique Student Manual, the peroneal kick is one of the most "effective" counterstrikes that seldom results in injury "more than a bruise," which in itself is a "rare occurrence." The defendants also contend that spraying plaintiff's face with CS tear gas was a routine and rational maneuver, given that plaintiff was trying to fend-off being handcuffed and had eluded the officers during the high-speed pursuit. Also, the Michigan State Police point out that they all put their weapons away after plaintiff was removed from the vehicle and following a determination that there was no other individual at the scene. Lastly, the Michigan State Police assert that the overwhelming evidence is that plaintiff was not kicked in the groin area, as she alleges. Pierce, Holme, Crawford, Harris and Tamlyn all testified that they never witnessed such a strike or strikes. Drew testified that he did not observe the entire arrest, so could not conclude whether any officer struck plaintiff's vaginal area. Only the plaintiff recalls such a blow.

Plaintiff argues that the force was excessive because she sustained severe injuries requiring medical attention. She admits that she was screaming for her dog, but denies that she was resisting arrest. She claims that officers "yanked" her out of her vehicle, threw her to the ground face down and immediately handcuffed her. After handcuffing her, one unidentified officer allegedly had his knee to her back and another to her head. She was then, so she asserts, pepper-gassed, and following the use of this chemical, blows were administered from behind and up between her legs. Her legs were allegedly spread slightly apart.

She proffers pictures of her inflamed vaginal area and hospital records dated the day of the incident, which establish that plaintiff had a growing hematoma in this region of her body. Plaintiff asserts that such evidence "speaks for itself" and amply raises a genuine question as to whether the police officers actually beat her after handcuffing her. Furthermore, plaintiff insists that the credibility of the police officers' deposition testimony is dubious. At officer Harris's deposition, he contradicted testimony he gave at the criminal trial. At his deposition he admitted to attempting one peroneal kick, yet at the criminal proceeding, he averred that he did not strike plaintiff at all.

This court finds that the Michigan State Police are not entitled to summary judgment on plaintiff's claim of excessive force during her arrest. There are genuine issues of material fact as to whether plaintiff was resisting arrest, whether she was kicked in the vaginal area, and whether the application of CS tear gas and the alleged kicks occurred after she was handcuffed. Overall, there is the factual issue of whether the force used was objectively reasonable under the totality of circumstances. These questions must be resolved by a jury, and thus the Michigan State Police motion for summary judgment on this issue must be denied. *See Pastre v. Weber,* 717 F.Supp. 992, 995 (S.D.N.Y.1989) (finding that accumulating anger in an officer as a result of being led on a high-speed chase by adolescents provoked the officer to use excessive force).

In reaching such a conclusion, this court is well aware of the fact that "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary," *Graham,* 490 U.S. at 397,

109 S.Ct. at 1872. Moreover, this court is cognizant of the crime for which plaintiff was being implicated (e.g. narcotics violations) and the fact that a high-speed chase preceded her arrest.

### D. The Eleventh Amendment

The Michigan State Police make one last argument in their motion for summary judgment. They contend that plaintiff's claims against them are barred by the Eleventh Amendment. U.S. Const.. amend. XI. They insist that all Michigan State Police Officers have been named in their official capacities. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 105–06, 104 S.Ct. 900, 910–11, 79 L.Ed.2d 67 (1984).

■ A review of the complaint discloses that plaintiff is suing the officers in their individual capacities. All defendants are continually identified by their individual names. Moreover, the damage count of the complaint, Paragraph 48, requests relief against the Michigan State Police in their individual capacity. Paragraph 48 reads, in relevant part as follows:

> Wherefore, Plaintiff, Donna White, seeks a judgment against Defendants, Wayne County and its' Wayne County Sheriffs Department, Robert A. Ficano, Rick Holme, Robert Pierce, Mark Tamlyn, Michael Harris, Dwayne Crawford, and Lil Jon Drew, *individually* and/or in their official capacities, jointly and severally ...

Since the complaint clearly names the Michigan State Police in their individual capacities, her claims against them are not barred by the Eleventh Amendment. *See* Fed.R.Civ.P. 8 (court must construe complaint so as to do substantial justice).

### IV. COUNTY'S MOTION FOR SUMMARY JUDGMENT

The second summary judgment motion was filed by Wayne County Sheriff's Department, County of Wayne and Sheriff Robert A. Ficano as well as Deputies. Pierce and Holme. As a preliminary matter, plaintiff has stipulated to dismissing Wayne County Sheriff's Department, County of Wayne and Sheriff Robert A. Ficano in both his official and individual capacities. Also, plaintiff has

agreed to dismiss Pierce and Holme in their official capacities. In the wake of these stipulations, all that needs to be decided is whether' summary judgment should be entered on plaintiff's claims against Pierce and Holme, as individuals.

### A. Plaintiff's Claims Against Pierce and Holme

Deputies Holme and Pierce (hereinafter collectively "Deputies") argue that qualified immunity shields them from plaintiff's § 1983 claims against them. It appears that plaintiff is asserting the following claims against these two defendants: (1) filing false police reports; (2) failure to intervene in the alleged beating during her arrest, (3) failure to take a blood exemplar to test for cocaine, and (4) testifying falsely at the criminal trial.

■ Before addressing whether qualified immunity shields these Deputies from such claims, this court dismisses plaintiff's § 1983 cause of action for testifying falsely. Absolute immunity shelters Deputies Pierce and Holme from this theory of liability. *See Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

### 1. Qualified Immunity

Qualified immunity is an affirmative defense that protects government officials performing discretionary functions from personal liability unless their actions violate clearly established law of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "The first step in a qualified immunity analysis is whether, based on the applicable law, a constitutional violation occurred." *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir.1996) (citations omitted): *In re City of Philadelphia Litigation*, 49 F.3d 945, 961 (3rd Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 176, 133 L.Ed.2d 116 (1995). If a constitutional violation is found, the court next examines whether it involves "a clearly established constitutional right[ ] of which a reasonable person would have known" at the time of the actions in question. *Dickerson*, 101 F.3d at 1158. *See also Rich v. City of Mayfield Heights*, 955 F.2d 1092,

1095 ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.") (citation omitted). The Supreme Court elaborated on what is meant by "clearly established right" in *Anderson v. Creighton:*

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful ... but it is to say that in light of pre-existing law the unlawfulness must be apparent.

483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Moreover, in ascertaining whether the constitutional right is "clearly established," this court must "look first to the decisions of the Supreme Court, then to decisions of this Court [the Sixth Circuit] and other courts within our circuit, and finally to decisions of other circuits." *Dickerson,* 101 F.3d at 1158.

"Once it is determined that the right is clearly established, the court must determine 'whether the plaintiff has alleged sufficient facts supported by sufficient evidence to indicate that what the officer allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *Dickerson,* 101 F.3d at 1158. *See also Johnson v. Estate of Laccheo,* 935 F.2d 109, 111 (6th Cir.1991).

### a. Filing False Police Reports

■ Keeping this standard in mind in the instant case, qualified immunity shields the Deputies from plaintiff's claims of filing false police reports. As discussed earlier in this opinion, the mere filing of police reports, alone does not amount to a constitutional violation. *Landrigan v. City of Warwick,* 628 F.2d 736, 745 (1st Cir.1980).[11] Since no constitutional violation has occurred, plaintiff has no § 1983 claim against these Deputies.

### b. Failing to Test Plaintiff's Blood for Cocaine

■ Plaintiff also contends that the Deputies violated her constitutional rights by failing to obtain a search warrant to test plaintiff's blood for cocaine at both Detroit Receiving or Hutzel hospitals. Plaintiff argues that both Pierce and Holme accompanied her to these institutions, knew that her blood had been drawn, and could have easily obtained a warrant to test that blood for controlled substances. Such a charge under § 1983 must be dismissed since the plaintiff suffered no constitutional deprivation as a result of this nonfeasance. Plaintiff has failed to cite any case imposing an affirmative duty on a police officer to ·conduct a search, i.e. blood test. And, in fact, as succinctly stated by the Seventh Circuit in *Kompare v. Stein,* 801 F.2d 883, 890 (7th Cir. 1986), "the law appears to be just the opposite," meaning that the police "have no constitutional duty to keep investigating a crime once they have established probable cause." *Id. See also Duca v. Martins,* 941 F.Supp. 1281, 1290 (D.Mass.1996) (holding that "a criminal suspect has no constitutional right to a perfect investigation"); *Miller v. Vasquez,* 868 F.2d 1116, 1119–20 (9th Cir.1989) (finding no case "which holds that the due process clause is violated when the police fail to gather potentially exculpatory evidence").[12]

---

**11.** As one aspect of this claim, plaintiff contends that the police report was false because it understated the severity of her injuries at the scene of the collision. The report read as follows:

> After being advised by responding medic personnel that defendant White *did not have life threatening injuries* and only required observation, defendant White was transported to Detroit Receiving Hospital via C.E.M.S. Unit # 726, then to Hutzel Hospital.

The aforementioned statement made in the report was not inaccurate. All that was represented in the report was that the Deputies were advised by the Emergency Medical Service that plaintiff did not have life-threatening injuries. Nothing was false about the aforementioned statement made in the report because the Deputies were so advised.

**12.** It should be noted that in *Miller,* the court held that a "bad faith failure to collect potentially exculpatory evidence would violate the due process clause." *Miller,* 868 F.2d at 1120. This decision is an aberration and the law only in the Ninth Circuit. Thus, this right is not "clearly established."

*Cf. Houston v. Partee,* 776 F.Supp. 1309, 1312 (N.D.Ill.1991) (holding that police officer is entitled to qualified immunity where complaint alleges failure of officer to search out convict after his conviction for purpose of disclosing recently discovered exculpatory evidence since there was not clearly established authority imposing such a duty); Stanley Z. Fisher, *"Just the Facts, Ma'am:" Lying and the Omission of Exculpatory Evidence in Police Reports,* 28 New Eng. L.Rev. 1, 44 (1993). Having impugned no constitutional right by failing to test her blood for drugs, the Deputies are good-faith immune from liability under § 1983.[13]

#### c. Failure to Preserve the Original Lien Report

Plaintiff in her brief alludes to the fact that the Deputies failed to preserve exculpatory evidence, to wit: the original lien report by Wayne County Dispatch and/or Michigan State Police Dispatch. She seems to be asserting that this action constituted a violation of her substantive due process rights under the Fourteenth Amendment of the Constitution of the United States. This court holds that the Deputies did not violate any such rights, and therefore are entitled to qualified immunity.

In *California v. Trombetta,* 467 U.S. 479, 481, 104 S.Ct. 2528, 2530, 81 L.Ed.2d 413 (1984), the Supreme Court held that it.was a violation of due process to fail to preserve "material" evidence, meaning evidence that might be expected to play a role in the defense, after it is gathered and in possession of the police when two conditions are met. First, the evidence must "possess an exculpatory value that was apparent before the evidence was destroyed," and second, it "must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489, 104 S.Ct. at 2534. Moreover, the Supreme Court held that failure to preserve evidence that is *potentially* exculpatory violates due process if the police acted in bad-faith. *Arizona v. Youngblood,*

488 U.S. 51, 58–59, 109 S.Ct. 333, 337–38, 102 L.Ed.2d 281 (1988), *reh'g. denied,* 488 U.S. 1051, 109 S.Ct. 885, 102 L.Ed.2d 1007 (1989). What is clear in either situation however is that the evidence must be of more than speculative exculpatory value. The Fourteenth Amendment does not impose "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Id.* at 58, 109 S.Ct. at 337. In the case at hand, there is no evidence of any kind that this so-called lien report was indeed exculpatory. It is pure conjecture whether the lien report would play a role in the exoneration of plaintiff. When "there is no indication that there was anything exculpatory about destroyed evidence, due process has not been violated." *United States v. Jobson,* 102 F.3d 214, 219 (6th Cir.1996) (*citing United States v. Braggs,* 23 F.3d 1047, 1051 (6th Cir.1994)). In this respect, the instant case is analogous to *United States v. Jobson,* where the court found no constitutional violation when police failed to preserve a dispatch tape since there was no evidence of any kind that the dispatch tape would contain exculpatory information. 102 F.3d 214, 219 (6th Cir.1996).

#### d. Failing to Intervene During the Arrest

Plaintiff's last claim against the Deputies is that they failed to intervene and curtail the excessive use of force employed during her arrest. She asserts that these officers were present at the time of the arrest, should have seen her being beaten, and could have taken reasonable steps to protect her from the use of excessive force by other officers. In a nutshell, she contends that the Deputies cannot don the mantle of qualified immunity since their failure to intervene was objectively unreasonable in light of the law at the time the arrest took place.

Long before this incident occurred, it was clearly established that the Due Process Clause imposes on a police officer the duty to intervene and protect a citizen from another's use of excessive force. This duty was

---

**13.** Plaintiff's claim is unusual because typically the argument is *not* that a blood sample should have been taken, but that the taking of a blood

sample constituted an unreasonable search proscribed by the Fourth Amendment.

originally defined in the case of *Byrd v. Brishke*, 466 F.2d 6 (7th Cir.1972), where the Seventh Circuit concluded that "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person." *Id.* at 11. The court in *Byrd* stated that officers should not be insulated "for reasonably foreseeable consequences of the neglect of their duty to enforce the laws and preserve the peace." *Id. See also Putman v. Gerloff*, 639 F.2d 415 (8th Cir.1981) (deputy's failure to intervene in beating administered by sheriff sufficient to subject him to liability). *Byrd* has since been adopted by the Sixth Circuit. *See e.g. Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir.1982) (holding that "it is not necessary, in order to hold a police officer liable under section 1983, to demonstrate that the officer actively participated in striking a plaintiff"), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983).

Having identified the right as "clearly established," the court must now determine whether plaintiff has presented sufficient evidence showing that the Deputies' actions were objectively unreasonable in light of the clearly established right for purposes of defeating Pierce and Holme's motion for summary judgment on this claim. This court submits that she has.

The Deputies argue that their actions in not interceding were objectively reasonable. According to the deposition testimony of Deputy Pierce, he was standing fifteen feet behind the suspect vehicle. He testified at his deposition that he had a general observation of the arrest, but was focusing his interest and attention on whether there was any danger remaining inside the suspect vehicle. He stated that her vehicle was obstructing his view of her as she lay on the ground. Deputy Holme on the other hand, testified at his deposition that he was standing at the passenger side of his vehicle at the initial stage of the arrest. He was on the radio attempting to secure an EMS to the scene. Sometime during her arrest, he moved to the rear of his vehicle and then had only a limited view of her arrest.

This court finds that there is a genuine question of fact as to whether it was reasonable for Pierce and Holme not to intervene under the circumstances. The alleged gassing and beating of the plaintiff was at most for a period of a few minutes. Plaintiff does not, however, know what these Deputies were doing at the time the other officers were arresting her. She had no view of them, was blinded by the pepper gas and thus cannot controvert their testimony. Plaintiff, however, has pointed out the inconsistencies in the Deputies' current rendition of the facts. For instance, at the preliminary exam conducted on January 5, 1994 (12 days after the incident), Pierce boldly proclaimed that "yes I was on the scene and observed everything that took place." This seems contradictory to his present position that he merely had a "general observation" of the arrest since his attention was focused, not on plaintiff, but on the interior of the vehicle. In sum, there are genuine issues as to whether defendants saw the other officers use force, and whether there was sufficient time to intervene or prevent the alleged harm from occurring. These are issues for the trier of fact to resolve. *See Medley v. Turner*, 869 F.Supp. 567, 572 (N.D.Ill.1994) ("Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise."). *See also Diebitz v. Arreola*, 834 F.Supp. 298, 304 (E.D.Wis.1993) (holding that officer had ample opportunity to make some type of effort to protect plaintiff from being beaten during a jail elevator interlude lasting 30 to 60 seconds, even if it was a small gesture such as shouting to her fellow officers to stop the beating).

This court grants summary judgment in favor of the Michigan State Police Troopers Tamlyn, Harris, Drew and Crawford on all plaintiff's claims except for her claim that these defendants used excessive force during the arrest in violation of her Fourth Amendment rights. This court grants summary judgment to defendants County of Wayne, Wayne County Sheriff's Department, Wayne County Sheriff Ficano in his official and indi-

vidual capacity, and Holme and Pierce in their official capacities on all plaintiff's claims pursuant to stipulation of the parties. Furthermore, this court grants Deputies Holme and Pierce summary judgment on plaintiff's claims of filing false reports, failing to test plaintiff's blood for cocaine, testifying falsely, and failing to preserve the original lien report. This court denies Pierce and Holme's motion for summary judgment on plaintiff's claim of failing to intervene to safeguard her from the other officer's use of excessive force during her arrest.[14]

### ORDER

**IT IS HEREBY ORDERED** that the summary judgment motion filed by defendants Mark Tamlyn, Michael Harris, Dwayne Crawford and Lil Jon Drew's motion be **GRANTED** in part and **DENIED** in part for the reasons expressed in this opinion.

**IT IS FURTHER ORDERED** that the summary judgment motion of defendants County of Wayne, Wayne County Sheriff's Department, Robert A. Ficano in his official and individual capacity, and Richard Holme and Richard Pierce in their official capacities be **GRANTED** for the reasons expressed in this opinion.

**IT IS FURTHER ORDERED** that summary judgment motion of defendants Richard Holme and Richard Pierce in their individual capacities be **GRANTED** in part and **DENIED** in part for the reasons expressed in this opinion.

**SO ORDERED.**

---

**14.** Plaintiff also seems to be asserting a conspiracy claim on the grounds that the officers jointly participated in a cover-up of the alleged brutality that she suffered in an effort to deprive her of her § 1983 right of action as to the alleged use of excessive force. *Comfort v. Town of Pittsfield,* 924 F.Supp. 1219, 1229 (D.Me.1996). This court expresses no opinion as to whether plaintiff has adequately pled such a claim or as to the merits of such a claim.